UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:  1:25-cv-00096

UBER TECHNOLOGIES, INC.

       Plaintiff,

v.

SCOTT MOSS, Director of the Division of Labor
Standards and Statistics, in his official capacity, and
JARED POLIS, Governor of Colorado.

       Defendants.

---

**PLAINTIFF'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

Plaintiff Uber Technologies, Inc. ("Uber"), brings this Complaint for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

**1.** Two Colorado laws impose an unprecedented and unconstitutional regime of both compelling and prohibiting certain speech on transportation network and delivery network companies, like Uber. The laws—SB24–075 ("TNC Act") (codified at Colo. Rev. Stat. § 8–4–127) and HB24–1129 ("DNC Act") (codified at Colo. Rev. Stat. § 8–4–126) (collectively "Acts"), and specifically, provisions in section 11 of the TNC Act and certain provisions in section 3 and 6 of the DNC Act, contain disclosure requirements that prohibit Uber from speaking until Uber conveys the State's preferred message; compel Uber to speak in specific ways down to time, content, and font; and alters Uber's speech, in a way that would contradict Uber's expressive

choices. Nor can the Acts withstand scrutiny. Even under the most generous reading, they do not further any legitimate state interest.

2.      The Acts do not just compel speech; they compel Uber to shout the State's message. Portions of both Acts go so far as to demand that Uber "prominently display[]" the speech "[i]n a font that is at least one and one-half times larger than the font used to present any other information on the screen" *and* "using design techniques intended to draw the eye to the information." TNC Act §11(e)(I)-(III); DNC Act §3(f)(I)-(III). Worse, the message that the State wants Uber to shout is incomplete, misleading, and likely to cause reputational harm to Uber. These Acts are unlike any other and constitute a deep invasion by the government into the content, screen-flow, look and timing of a company's smartphone application, down to the font size. In fact, two sections of the TNC Act seek to compel Uber to express the State's viewpoint that Uber does not sufficiently compensate its drivers (*i.e.,* earners), a controversial and inaccurate message Uber cannot be compelled to express without offending core First Amendment principles.

3.      The Court should not countenance any suggestion that the Acts are narrowly tailored to achieve a compelling state interest or that there are no less restrictive alternatives that would serve the government's purpose. Neither the TNC nor the DNC define "transparency" or "protections for drivers," which on their own are far too broad and nebulous to be compelling interests. Yet, the State thinks it can compel Uber to speak to achieve these vague purposes. Uber brings this action for declaratory and injunctive relief because these Acts must be enjoined as unconstitutional to prevent constitutional harm to Uber.

4.      The TNC Act applies to transportation network companies and primarily consists of two parts, one relating to deactivation and suspension procedures and the other relating to what the TNC Act calls "transparency for drivers and consumers."  Uber's challenges now are to provisions of Section 11, which require Uber to electronically disclose certain information to drivers and riders beginning on February 1, 2025.  The DNC Act applies to delivery network companies and concerns "protections for drivers."

5.      The extent of regulation in these Acts is unprecedented.  For example, the DNC Act threatens delivery network companies[1] with draconian statutory damages of *one thousand dollars* on a per-consumer or per-driver basis if the company is considered out of compliance with vague display requirements directing DNCs to present information "prominently…on the screen" or "using design techniques intended to draw the eye to the information."[2]  The TNC Act fares no better.  It subjects transportation network companies,[3] like Uber, to statutory damages in the amount of *one thousand dollars* on a per-consumer or per-driver basis, plus an additional one hundred dollar penalty, if they violate any of the Acts' technicalities.[4]  Thus, if Uber does not calculate tax deductions for independent third parties, because, as is the case for Uber, it is not certified to give tax advice, Uber could be liable for excessive and unconstitutional statutory

---

[1]  Defined in the DNC Act as "any person that sells the delivery of goods or services, including delivery provided as part of the sale of goods, in the state and that engages or dispatches delivery drivers through a digital platform."  DNC Act § (1)(c)(I).

[2] DNC Act § 3(f)(I)–(III), (8)(I); *see also* TNC Act § 11(e)(I)–(III), (13)(a)(I).

[3] Defined as "a corporation, partnership, sole proprietorship, or other entity, operating in Colorado, that uses a digital network to connect riders to drivers for the purpose of providing transportation."  C.R.S.A.. § 40-10.1-602 (3).  And with the stated exclusions in TNC Act §(1)(q).

[4] TNC Act § (13).

damages and civil penalties. These are just a few of the many examples of the extreme effects that would result from the execution of these overzealous Acts.

6.     The Acts authorize the director of the Division of Labor Standards and Statistics or his or her designee with enforcement, including by imposing penalties. *See* Colo. Rev. Stat. Ann. § 8–4–101; C.R.S.A. § 8–4–126(8); C.R.S.A § 8–4–127(13). The penalties and enforcement mechanisms are extensive, and in addition to those stated above, include a fine or $100 per violation, as determined by the director on a per-consumer or per-driver basis. *See* TNC Act § (13)(a)(II); DNC Act § (8)(II)–(III).

7.     Uber has willingly and in good faith engaged with regulators in Colorado and across the country to try and promote regulations that promote important goals like consumer and driver welfare and safety.

8.     But "whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles" of the First Amendment "do not vary." *Brown v. Ent. Merchs. Ass'n.*, 564 U.S. 786, 790 (2011) (quotations omitted). Where novel regulation infringes upon the First Amendment's rights of free speech and the government cannot meet its burden under the law to justify such infringement, as is the case here, then the law must give way to Uber's constitutional rights.

9.     Uber is a technology company that operates in Colorado, and throughout the United States, two technology-enabled marketplaces, one for mobility and one for food and other merchandise delivery (collectively "marketplaces"). This case implicates Uber's mobility and delivery platforms. And, specifically, Uber's speech to Colorado consumers, both drivers and consumers, who use the platforms, which the Acts seek to regulate.

4

10.    Uber's mobility marketplace connects both individuals who are looking to earn money by providing transportation services on their own schedule, and individuals who are looking to obtain such transportation services. Uber's delivery marketplace connects merchants like restaurants, with consumers seeking delivery services, and individuals looking to earn money by completing deliveries on their own schedules. Both marketplaces provide millions of drivers (*i.e.,* earners) with the opportunity to earn income by providing those services.

11.    Each day, through Uber's rideshare and delivery platforms, Colorado's independent drivers are connected with riders who request rides and/or consumers who request the delivery of meals, groceries, and more, primarily through its driver–facing and consumer–facing smartphone applications ("Uber App" or "App").[5] In so doing, Uber is part of a dynamic market and competes vigorously for drivers' and consumers' attention including by providing its services in a way that builds (and keeps) driver and consumer trust and protects their safety.

12.    Uber endeavors to provide consumers and drivers with a seamless and frictionless experience while also providing the information they want and need at a time and place where it is useful and helpful to them. Simultaneously, Uber does not overload them with information that they do not want or need. Uber's decisions about what information to share and when are tailored to its platform to promote safety, privacy, reliability, quality, and a positive driver and consumer experience.

---

[5] Uber's technology platform is accessed primarily through three apps: (1) Earner App - accessed by persons conducting earner rides and deliveries; (2) Rider App - accessed by consumers seeking rides; and (3) Eater App - accessed by consumers seeking food through Uber Eats.

13.     Colorado legislators claim to have drafted the Acts to address a purported need for "transparency" and "protections for drivers" engaged with transportation network companies and delivery network companies, like Uber.[6]   Bill sponsors articulated a need to "improve transparency" for workers, including so that they are not encumbered by "misleading incentives."[7] Uber, however, already strives to provide drivers with accurate and clear information that allows drivers to decide whether to continue using the platform.  As a result, Uber has aimed "to provide [its] users — drivers, couriers, merchants, and their customers — with transparency around how the platform works, including how prices are formulated."[8]

14.     However, the Acts' Driver Facing Disclosures of Total Rider Payment (§ 11(b)(I)–(III)); Rider Facing Disclosure of Driver Earnings (§ 11(d)(II)); Aggregated Mileage and Time Disclosures (§ 11(a)(III)–(IV)); DNC § 3(a)(III)–(IV); DNC § 3 (f) (together the "DNC Offer Card Requirements"); TNC Act § 11(e) ("Display Requirements"); TNC IRS Disclosures (§ 11(f)(III)–(V)) ("IRS Disclosures"), and DNC § 6 ("Courier Safe Path Disclosures"), (hereinafter, referred to collectively, as ("Disclosure Requirements") compel Uber to alter the content of its speech to drivers and riders and are, therefore, presumptively unconstitutional.  Specifically, the Disclosure Requirements compel Uber to speak the State's preferred message and to the State's preferred audience and at the State's preferred time, prohibit Uber from speaking until it does so, and in

_____

[6] S.B. 24-075, 74th General Assembly (2024) (enacted), HB 24-1129, 74th General Assembly (2024) (enacted).

[7] *ICYMI: Joint Release: New Protections For Delivery Drivers Signed Into Law*, Colorado Senate Democrats,  https://tinyurl.com/2s37cwak (last visited Jan. 4, 2025).

[8] Miriam Chaum, *Understanding Upfront Fares,* Medium (April 28, 2023), https://medium.com/uber-under-the-hood/understanding-upfront-fares-491cbaf975d6#:~:text=Introducing%20Upfront%20Fares%20for%20drivers,enough%2C%20they%20can%20decline%20it.

some cases, require Uber to alter and undermine its own reputation and its own its speech on controversial issues important to its business in a way that is incomplete, misleading, and likely to cause harm to Uber.

15.     Accordingly, Uber seeks declaratory relief, a temporary restraining order and preliminary and permanent injunctive relief on the grounds that the Acts violate Uber's free speech rights under the First Amendment to the United States Constitution.  Uber seeks to vindicate the deprivation of constitutional rights under the color of state statute, custom, and/or usage.  Uber is also entitled to attorneys' fees and costs if it prevails on any of its § 1983 claims.  *See* 42 U.S.C. § 1988.

## THE PARTIES

16.     Plaintiff Uber is a Delaware corporation with its principal place of business in San Francisco, California.

17.     Defendant Scott Moss is the Director of the Division of Labor and Standards and Statistics, and is sued here in his official capacity.  As Director, Mr. Moss is charged with enforcing the Acts, including the provisions complained of herein.  *See* TNC Act § 2(b)(3); Colo. Rev. Stat. Ann. § 8–4–101.

18.     Defendant Jared Polis is the Governor of Colorado, and is sued here in his official capacity as head of the Colorado Executive Branch.  As Governor, it is within the scope of his work to repeal legislation found unconstitutional.

19.     Both Mr. Moss and Mr. Polis will hereinafter be referred to jointly as "Defendants."

## JURISDICTION AND VENUE

**20.**    This Court has jurisdiction over Uber's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. § 1983 because Uber alleges violations of its rights under the First Amendment to the U.S. Constitution.

**21.**    The Court may award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2022, as well as any other equitable relief it deems appropriate under its inherent powers.

**22.**    Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b)(1) because Defendants are located within this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Uber's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.    Uber Values Safety and Transparency

**23.**    Person–to–person connections are at the foundation of Uber's business, putting safety, efficiency, and reliability at the core of Uber's mission.  Uber operates on a global scale and believes both safety and satisfying both its drivers' and consumers' needs are paramount to the success of its marketplaces.  Accordingly, a fundamental tenet of Uber's mission is to make safety "a top priority every single day" and "embed [it] into everything we do."  Uber prioritizes driver and rider safety in its mobility and delivery marketplace.[9]

**24.**    Uber makes this commitment to safety clear to the public by stating that the company "care[s] deeply about the safety of the millions of people using our platform," that

---

[9] *Values,* Uber, https://www.uber.com/us/en/careers/values/ (last visited Jan. 2, 2025).

"[s]afety is embedded in [Uber's] cultural values," and that it is committed to "safety and transparency" because "secrecy doesn't make anyone safer."[10]

26. In order to convince drivers—who have a variety of other earning opportunities available to them—to use the Uber platform, and to address substantial misunderstanding, Uber is also transparent with its drivers as to the consumer price, third-party fees, taxes, operational expenses, and Uber's Service Fees.[11]

## II. Uber's Service Fees and Misconceptions

26. Drivers pay Uber an amount, called a Service Fee, on completed trips. Following a ride or delivery, drivers can see how much they pay in Service Fees in their ride receipts, online dashboards, and weekly statements, *see infra* ¶¶ 49–52. Drivers can also see a breakdown of their earnings in those locations. These breakdowns provide drivers with important context about how much they are earning versus how much they pay Uber in Service Fees.

27. Service Fees are variable and are not a fixed amount or a fixed percentage fee. Having variable Service Fees helps Uber make less desirable routes appealing enough to drivers to compete and ensure riders in need of such trips have a positive marketplace experience.[12] Trips with higher service fees help allow Uber to price other trips at lower amounts that help make rides more affordable for more people, which creates more opportunities for drivers. Because

---

[10] *2021-2022 US Safety Report*, Uber, 3, 12, 22, https://uber.app.box.com/s/lea3xzb70bp2wxe3k3dgk2ghcyr687x3?uclick_id=7b682b1a-ca30-4310-b88c-e7d072cd23fc (last visited Jan. 2, 2025).

[11] *Service Fee, Explained*, Uber, https://www.uber.com/us/en/drive/driver-app/service-fee/ (last visited Jan. 10, 2025).

[12] *How Can Pricing Serve Riders and Drivers*, Uber, https://www.uber.com/us/en/marketplace/pricing/service-fee/ (last visited Jan. 8, 2025).

Service Fees are variable, looking at the Service Fee on one trip can be misleading as to Uber's practices generally.

28.    The Service Fee that drivers pay Uber is not the only amount that makes up the difference between what a rider pays, and a driver's earnings. There are also things like road, tunnel, and bridge tolls, mandatory insurance that Uber maintains on behalf of driver, and other government-mandated taxes.[13]

29.    As an example, Colorado has since mid-2022 imposed a "pre-arranged ride fee" on transportation network companies, such as Uber, for prearranged rides requested and accepted through a digital network operated by the transportation network company, with transportation network companies being responsible for filing a return with and paying the prearranged ride fee.[14]

30.    In Colorado, Uber must obtain insurance for each driver in the amount of $200,000 per person and $400,000 per occurrence for damages caused by uninsured motorists.[15] Insurance costs in Colorado are significantly higher than in certain other states. Uber covers these mandatory insurance costs, including in Colorado, through a fee charged to riders called the "Booking Fee."[16]

31.    There can be a misconception among users that Uber retains the entire difference between what a rider pays for a trip and what a driver retains as earnings for the trip, which is not

---

[13] *Service Fee, Explained*, Uber, https://www.uber.com/us/en/drive/driver-app/service-fee/ (last visited Jan. 8, 2025).

[14] *Prearranged Ride Fee*, Colorado Department of Revenue (July 1, 2022), https://tax.colorado.gov/prearranged-ride-fee.

[15] Rideshares And Uninsured Motorist Insurance Coverage, H.R. 22-1089, Gen. Assemb., Reg. Sess. (Colo. 2022), available here https://leg.colorado.gov/sites/default/files/2022a_1089_signed.pdf.

[16] *Booking Fee*, Uber, https://help.uber.com/en/riders/article/booking-fee?nodeId=ab5837e4-8f55-442c-9894-15c1d4131fe9 (Jan. 8, 2025).

accurate.  To try to help drivers understand Uber's Service Fees and the other elements that make up the difference between rider prices and driver earnings, Uber provides detailed fare breakdowns.  For example, take a ride receipt that informs the driver the rider price for the trip was $14.38, and the amount the driver earned pre-tip was $6.06 **(Figure 1 below)**.  If Uber did not provide a fare breakdown, it would seem like Uber charged the driver $8.32 in connection with the ride.  But as **Figure 1** shows, $2.24 of the amount Uber received is for insurance that Uber pays on behalf of the driver.  This context is important for drivers to understand how much they are actually paying Uber to use Uber's platform, and to avoid false impressions.



**Figure 1**

32.     Because drivers are Uber's customers, and Uber vigorously competes for their business, it is very important that drivers understand the relationship between their earnings and the Service Fee Uber charges, as well as the costs that are imposed by the State, such as for government fees and high-limit insurance.  That is, that drivers understand the fee is reasonable in proportion to the service performed.  Fare breakdowns help provide this context and ensure drivers understand the percentage that Uber actually retains and where the rider price actually goes.

33.     In order to help drivers and riders understand the charges and costs associated with use of its platform, Uber provides information on its website that breaks down "where the customer price goes" and points to where drivers can "check the service fee each week" which discloses "a detailed breakdown of rider payments and what goes to commercial auto insurance, city/region fees, tolls, and airport surcharges . . . [and] the amount Uber takes to keep the app running and improving.[17]  Uber has also launched campaigns to better explain its pricing models and their changes over time through different mediums, such as blogs,[18] and campaigns like the Effective Commission Rate ("ECR") media campaign, to give drivers' insight into Uber's Service Fee and the myriad factors that influence it and others components.  The campaign was launched online through media outlets like Spotify, Instagram, and Meta.  Part of this campaign included a website

---

[17] *Service Fee, Explained*, Uber, https://www.uber.com/us/en/drive/driver-app/service-fee/ (last visited Jan. 8, 2025).

[18] Miriam Cahum, *Understanding Upfront Fares,* Medium (Apr. 28, 2023), https://medium.com/uber-under-the-hood/understanding-upfront-fares-491cbaf975d6#:~:text=Introducing%20Upfront%20Fares%20for%20drivers,enough%2C%20they%20can%20decline%20it; *Tracking Your Earnings*, Uber, https://www.uber.com/de/en/drive/basics/tracking-your-earnings/ (last visited Jan. 8, 2025). In addition to the general information available as part of this campaign Uber offers drivers individualized fare breakdowns available in-app and on its website.

with a comprehensive overview of the kind of earnings information available to drivers, as well as paid media in 21 cities across the U.S.  Through this campaign Uber reached over 800,000 drivers in the U.S. In addition to this campaign, Uber provides other access points for finding this type of data on the platform.[19]

### III.    Uber Prioritizes Safety in its Product Design

**34.**    Uber also makes its commitment to safety clear to the public by how "[s]afety is designed into the experience"[20] and its stated values of making Uber "safer for everyone using our platform."[21]  Uber also displays its commitment through its engagement on safety issues in the community.  For example, Uber created a Safety Advisory Board in 2015 that helps ground its approach to safety in "advice [Uber] receives from safety experts and advocates."[22]  The Board advises Uber how to "enhance safety" by means of its policies and processes.[23]

**35.**    Uber communicates and lives its dedication to safety in numerous ways, including through its industry-leading Safety Report,  and through its Community Guidelines.  Uber's publicly available Community Guidelines apply to the drivers, riders, and consumers who use Uber's platform.  These Guidelines focus on three tenets: treat everyone with respect, follow the

---

[19] This specific campaign is currently only for drivers who only do rideshare trips.  Those who do both deliveries and rides currently rely on the weekly statement.

[20] *Your safety drives us*, Uber, https://www.uber.com/us/en/drive/safety/ (last visited Jan. 3, 2025).

[21] *Values*, Uber, https://www.uber.com/us/en/careers/values/ (last visited Jan. 9, 2025).

[22] *Uber's Safety Advisory Board,* Uber, https://www.uber.com/us/en/safety/safety-advisory-board/?uclick_id=971c38ca-3a88-4c99-89b6-a3259d255f67 (last visited Jan. 3, 2025).

[23] *Id.*

law, and help "keep one another safe."[24]  The Guidelines note that Uber is "hard at work every day to help create safer experiences for everyone."[25]  These tenets guide how Uber builds and executes its business.  Uber "build[s] [its] technology with [driver] safety in mind" and in consultation with law enforcement to created specific driver safety tips to keep drivers safe while driving with Uber.[26]  These tips encourage drivers to "stay[] focused on driving" and do what they can to "help reduce dangerous distractions" while on the road.[27]

36.     Uber designs its App to promote efficient and frictionless experiences that promote safety for drivers while on the road.  Part of that design requires creating screenflows that allow drivers to engage with information that is useful for them to decide whether or not to accept a trip request, how to complete their ride while remaining safe on the road, and how to maximize their earnings.  From a safety standpoint, choosing when and how to provide information to drivers is a critical consideration, so that drivers are not overwhelmed with too much information or unnecessary distractions while on the road.  Uber addresses this need by being mindful of screenflow formatting such as font sizes, and how much information is available to drivers at a time.

---

[24] *Uber's Community Guidelines*, Uber, https://www.uber.com/us/en/safety/uber-community-guidelines/ (last visited Jan. 2, 2025).

[25] *Uber Community Guidelines*, Uber (Nov. 19, 2024), https://www.uber.com/legal/en/document/?name=general-community-guidelines&country=unitedstates&lang=en&uclick_id=12b99a8b-7b8b-4694-89df-ed092e6d41cb (Uber's full Community Guidelines).

[26] *Prioritizing Safety While Driving with Uber*, Uber, https://www.uber.com/us/en/drive/safety/tips/ (last visited Jan. 2, 2025).

[27] *Id.*

**IV.**    **The Act's Required Disclosures Violate the First Amendment**

**A.** *Driver Facing Disclosures of Total Rider Payment (§ 11(b)(I)–(III))*

**37.**    TNC Section 11(b), requires Uber to electronically disclose to drivers on a single screen on the app: (I) the total amount of money that the rider paid for the transportation task, before any tip was added; (II) the total amount of money paid to the driver for the transportation task before any tip was added, excluding "pass-throughs," if any; and (III) the amount of the tip, if any.  Section 11(b) also has an important and problematic timing component–Uber must display the single screen containing all of this information when the driver resumes what the Act calls "available platform time" after completing a transportation task, *i.e.*, once the driver ends a trip and then remains online and available to receive another trip request

**38.**    The Disclosures also have formatting requirements for how this information is presented: it must be "prominently displayed on the single screen on the digital platform or in the email"; "[i]n a font that is larger than the font used to present any other information on the screen or in the e-mail; and [p]resented using design techniques intended to draw the eye to the information."  TNC Act § 11(e)(I)-(III).

1.  The Driver Facing Disclosures of Total Rider Payment Create Safety Risks.

**39.**    This novel requirement will create significant safety risks because it will disrupt and slow down post-trip processes and will require Uber to provide drivers with misleading and distorting information about their earnings and Uber's Service Fee on a "single screen" immediately after they complete a ride.

**40.**    Presently, after the ride is completed—that is, after the rider has been dropped off at their destination—the first screen drivers see is a "Rating Screen" that allows them to rate the

rider on a scale of one to five stars, by simply tapping their selected number of stars.  It has fewer than ten words, including the rider's first name.  Below is an example of this screen.



**Figure 2**

41.      Drivers' ratings of riders, and riders' rating of drivers, has been a core feature of the Uber mobility marketplace for a long time.  Mutual ratings allow drivers and riders to gather basic reputational information about each other when deciding to accept a trip request or a ride.  They facilitate accountability and behavior that complies with Uber's Community Guidelines, and they promote safety.  Uber also uses the ratings for various safety-related purposes and to protect and improve all users' experiences.

42.      The same is true for "UberX Share Rides"[28] or multiple rider and dropoff rides. Drivers rate riders once the last rider is dropped off.  Below is an example of this screen.

_____

[28] *UberX,* Uber, https://www.uber.com/us/en/ride/uberx/ (last visited Jan. 10, 2025).



**Figure 3**

43.     Uber provides this screen immediately after the completion of the Share ride, and without interruption, so that its design is aligned with its guidance to drivers to "stay[] focused on driving" and "give [Uber] feedback" by rating riders to help Uber improve its drivers' experiences and overall services.[29]   This makes it easy for drivers to efficiently transition towards what they are most interested in, the next earning opportunity.   It also serves both short-term safety by presenting a simple and easy to use screen and long-term safety, by facilitating ratings and accountability.

44.     The Driver Facing Disclosures of Total Rider Payment compels Uber to communicate inaccurate earnings and Service Fee information by requiring Uber to juxtapose, immediately post trip and "on a single screen," "[i]n a font that is larger than the font used to

---

[29] *Prioritizing safety while driving with Uber,* Uber, https://www.uber.com/us/en/drive/safety/tips/ (last visited Jan. 9, 2024).

present any other information on the screen," "[t]he total amount of money that the consumer paid for the transportation task before any tip was added" and "[t]he total amount of money paid to the driver for the transportation task before any tip was added, excluding pass-throughs, if any."  Importantly, this set of metrics cannot accurately describe what Uber charges as a Service Fee or what accounts for the difference between the rider's payment and the driver's earnings.

45.    To attempt to counter any confusion around what drivers receive and what Uber takes from each ride, at the time of the compelled speech, the new requirement would force Uber to provide drivers with additional complex information, while they are often still driving.  Such information would include information about Uber's Service Fee, and other fees that make up the difference between what a rider pays, and a driver's earnings, like bridge tolls and government-mandated taxes, *see supra* ¶¶ 28–30.  Additionally, it will take Uber approximately 14 seconds to present the mandatory information to drivers—whereas the rating screen was presented immediately.  This information lag increases the risk of safety incidents.[30]  This is precisely the type of risk Uber designs its products to avoid in an effort to increase driver safety.  For example, while Uber makes available earnings information through the app (*e.g.*, in a section called the

---

[30] *See, e.g.,* Department of Transportation, National Highway Traffic Safety Administration, Notice of Federal guidelines, https://www.federalregister.gov/documents/2013/04/26/2013-09883/visual-manual-nhtsa-driver-distraction-guidelines-for-in-vehicle-electronic-devices (Apr. 26, 2013) ("The NHTSA Guidelines recommend that devices be designed so that tasks can be completed by the driver while driving with glances away from the roadway of 2 seconds or less and a cumulative time spent glancing away from the roadway of 12 seconds or less."); *2-Second Rule for Distracted Driving Can Mean Life or Death*, NYT, Sep. 27, 2018 ("The odds of a crash double if your eyes are off the road for more than two seconds," said Wade Newton, a spokesman. Just two seconds can be the life-or-death difference between hitting that metalstrip, or a deer, and avoiding it."); *Distracted Driving*, GHSA, https://www.ghsa.org/issues/distracted-driving (last visited Jan. 9. 2025).

Earnings Hub drivers can access when they want to), Uber does not push earnings information to drivers immediately post-trip. Doing so would disrupt and cause delay in the driver's receipt of the next trip offer and would overload the driver with complex information at a potentially unsafe time, when the driver may be on the road. Further, Uber encourages drivers to "stay[] focused on driving" and do what they can to "reduce dangerous distractions" and does not overload them with information while they are driving to help them do so.[31]

46.     It is not feasible for Uber to have different mandatory screen flows for each state due to the required level of engineering efforts and ongoing maintenance. Additionally, every time Uber adds significant information to a screen, pulled from multiple sources, the risks of in-app glitches and issues rises, forcing Uber to spend more resources working to prevent those issues.

    2. <u>The Driver Facing Disclosures of Total Rider Payment Will Create Confusion and Promote Misconceptions Around Driver's Earnings.</u>

47.     The Driver Facing Disclosures of Total Rider Payment undermine Uber's ongoing efforts to communicate to drivers, riders and the public clarifying context about Uber's Service Fees to drivers by requiring it to present earnings information in a way that causes drivers to think that Uber is taking more from the ride than is accurate. Uber has limited time to communicate with drivers while they are on the platform. As such, when it is able to speak to drivers about their earnings, it seeks to do so in an accurate way that does not perpetuate misconceptions about Uber's revenues as compared to drivers' revenues. The Driver Facing Disclosures of Total Rider Payment compel Uber to use the limited time it has to communicate, to express a viewpoint mandated by the State and implicating the sufficiency of driver compensation in a misleading manner. This

---

[31] *Prioritizing safety while driving with Uber,* Uber, https://www.uber.com/us/en/drive/safety/tips/ (last visited Jan. 9, 2025).

precludes Uber from sharing the content it wishes to share until it has shared the State's required message.

48.    The State's message is evident by the cherry-picked figures it requires Uber to disclose to a driver immediately after the ride—a rider's pay and a driver's fare earnings, excluding pass-throughs. This limited view promotes the misconception amongst drivers and the general public that Uber takes the difference between those figures. When in fact, the difference between what a rider paid and what the driver earned does not account for tolls paid by the rider and transmitted back to the driver as part of their weekly toll reimbursements,[32] government mandated fees and taxes that Uber collects and transmits to the government, or the Booking Fee, which is an amount that the rider pays and which covers state-mandated insurance that Uber procures on drivers' behalves. For example, if a ride costs $24 and a driver earns $16, without proper context it appears like Uber made $8 in revenue, but it is not that simple.

49.    The government designed these disclosures to shame Uber as to driver earnings by making them appear smaller than what they are, relative to Uber's revenues. It does this in substance, by limiting what a driver sees, and in form by requiring that this be the information that is displayed "prominently" and "in a font that is **larger than** the font used to present **any other information,**" and at a time and place that does not allow Uber to meaningfully counteract the State's mandatory and misleading communication.. *See* TNC Act § 11 (e)(I)–(III) (emphasis added).

---

[32] *How are tolls paid?*, Uber, https://help.uber.com/driving-and-delivering/article/how-are-tolls-paid/?nodeId=55942c9a-675a-4808-b498-ae33754e7183 (last visited Jan. 9, 2025).

50.     Uber *already* provides drivers with numerous options for accessing accurate earnings information, in a time and place that is safe and useful because it allows for meaningful context, *see supra* ¶¶ 28–33.  For example, Uber provides drivers with information about their earnings, after the ride ends in at least three ways.

51.     First, drivers can check the ride receipt, which is available to them in their Uber Application, the Uber web portal, and via email.  This receipt contains a robust set of metrics, including (1) earnings (with a breakdown of fare and tip, if any); (2) ride duration; (3) ride distance; and (4) Uber's service fee summary, which contains a breakdown of all relevant components.  Below is a true and correct copy of a driver's receipt illustrating the aforementioned breakdown, among others:



**Uber Service Fee**                                            $5.76

This amount is what we take to serve
our users and run our business. t goes
toward things such as improving our
apps and expanding earning
opportunities. The Uber Service Fee is
collected from the customer fare but is
charged to you.

*Uber is not an insurer, insurance
agent, or insurance broker.
TNC/rideshare drivers must maintain
personal auto insurance as required by
local law.

**Certain charges, such as "airport
surcharges", relate to obligations
imposed by third parties, including
governmental entities. These charges
may be paid to those third parties or
used by Uber.

---

**Upfront Fare: $5.74**                                            ^

# Upfront Fare

Fare                                            $5.74    ⌄

---

**Total**                                            $5.74

**Figure 4**

52.    Second, drivers can access information, including earnings, about their ride by using their driver dashboards on a web browser at drivers.uber.com.  The dashboard includes information like rider pay and tip in aggregated form.



**Figure 5**

53.    Third, drivers can expect to receive information about their earnings from Uber in a weekly earnings report, which is sent to them weekly.  Also available to them weekly is a personalized in–app breakdown showing how their earnings were broken out, and reflecting costs like insurance, and other state–mandated costs that Uber takes into consideration when issuing its fees.  This personalized in–app breakdown was launched as part of Uber's ECR campaign, *see supra* ¶ 33.   Below is an example of this personalized in–app breakdown.



**Figure 6**

54.     Below is an excerpted and highlighted example of a weekly earnings report.  This
report provides drivers with their total earnings, pass-throughs, and a summary of total consumer
pay in aggregated form, with the option to drill down on amounts transferred to the driver's bank
account for specific transactions.  It also provides a breakdown of drivers' Service Fees—the
amount Uber charges to use the platform, and Booking Fees.  It further explains insurance issues,
regulatory–related charges and other helpful information.







**Figure 7**

55.     As shown above, information about earnings and Uber's Service Fees requires fulsome context to be complete and useful to drivers.  Because Uber believes context is important when providing earnings breakdowns, in order for Uber to both comply the with TNC Act's disclosure requirement and provide the information it believes is necessary for drivers to have the appropriate context, Uber would need to add the lengthy context already present in the drivers' receipts and earnings reports to a small mobile screen.  This  is not possible to do in a way that allows for full context and would result in Uber redesigning its Rating Screen in a way that is text–heavy and will increase the risk of driver distraction on the road.

56.     Disclosures would be text–heavy because Uber would have to include earnings breakdowns about pass-throughs and other relevant fees for a driver to understand their total earnings post–ride.  Text-heavy disclosures on the first screen drivers see post-ride (Rating Screen) would not be effective to convey all the information that Uber wants to convey to provide a full picture, and in any event, would distract drivers when they are on the road.  Relatedly, the smaller user-interface font that would be necessary to display all the required information would also be harder to read than the earnings information available to drivers in their ride receipts, webpage and in-App dashboard, or weekly earnings report, and would have to be smaller than the components that the State has mandated by larger than anything else.  This Disclosure Requirement forces Uber to prioritize the State's preferred message about drivers' earnings in a time, place and manner over Uber's own message.

57.     Finally, to comply with the Driver Facing Total Rider Disclosure Requirements, Uber not only has to share speech in a specific time and manner, it cannot communicate with or solicit information from drivers about that ride until it provides the specific information mandated

by section 11(b).  Thus, the inevitable result is that the Driver Facing Disclosures of Total Rider Payment both alter the content of Uber's speech and prevent Uber from speaking until the compelled message is shared.  These same issues arise in the context of UberX Share rides.

### B.  *The Rider Facing Disclosure of Driver Earnings (§ 11(d)(II))*

58.    The Rider Facing Disclosure of Driver Earnings require Uber to disclose to riders immediately post–trip and before giving the option to tip, the "(II) The total amount of money that the driver received or will receive for the transportation task before any tip is added, excluding pass–throughs."  TNC Act § 11(d)(II).  Like the Driver Facing Disclosures of Total Rider Payment, this provision would require Uber to attempt to follow vague mandates as to how to present the disclosure—*i.e.*, "prominently displayed" in a way that "draw[s] the eye[s] to the information" immediately following a trip.  TNC Act § 11(e).

59.    This is a novel requirement.  Uber does not currently provide riders with driver earnings information, and thus the Rider-Facing Disclosure Requirements' compel this earnings speech.  Because the Disclosure Requirement prevents riders from tipping before Uber gives the compelled message this Requirement also works to prevent Uber from speaking until the compelled message is shared.

1.    The Rider Facing Disclosure of Driver Earnings Will Promote
Misconceptions Around Driver's Earnings and Service Fees.

60.    Currently, after a ride is complete, the first screen that riders see presents them with the option to rate their driver and to add a tip for their driver.  Below is an example of this screen.



**Figure 8**

61. Riders are not required to keep their App open after beginning a trip. Riders may close the app entirely, and not reopen it for any number of hours or days. Riders also receive an emailed receipt with the total price paid for the ride and an accompanying breakdown of the fees charged for that ride, which includes a stated Booking Fee, and any other fees and taxes, where applicable. Rider receipts further provide a breakdown of insurance fees and mandatory taxes. Furthermore, the App also discloses to consumers that 100% of any tip they provide goes to drivers.

62. The TNC Act would require Uber to change the Rating Screen to provide riders with information that distorts how much Uber charges drivers as its Service Fee, is incomplete, and out of context. Similar to the Driver Facing Disclosures of Total Rider Payment, this Requirement compels Uber to disclose the total amount the rider paid and the amount the driver

earned, excluding pass-throughs (*i.e.*, fees reimbursed to the driver, such as tolls and airport access fees), and juxtaposes the two against each other immediately post trip—in a font larger than anything else. This presentation distorts how much the driver paid to Uber and makes it appear like Uber pockets the entire difference when in actuality Uber is paying costs incurred by and for the driver and mandated by the State. It would mislead and confuse riders about the amount drivers actually receive and the amount Uber actually retains.

63.    At bottom, this Disclosure Requirement is a veiled attempt at shaming Uber, and similarly situated companies, into changing its fees and causing unnecessary uproar around inaccurate data. Incomplete information does not help consumers and the State cannot explain how doing so would advance the Acts' purpose.

64.    Understanding the difference between what the rider pays and what a driver earns on a trip requires proper context that cannot be adequately provided on a single screen, and may be difficult to understand at a time when a person is not receptive to getting that information, for example, at the end of a ride when exiting a vehicle. Thus, the required disclosures distort riders' views of Uber's revenues and drivers' earnings.

65.    As previously stated, this is a novel requirement. For that reason, providing riders with proper context on earnings would be especially important. Otherwise, a rider will be unable to appreciate the information mandated by the Rider-Facing Disclosure Requirement. For example, riders might not realize that the figure does not include reimbursement amounts the driver may receive (*e.g.*, pass-throughs). Riders would also not likely understand that a significant part of the difference between what they pay and what a driver receives is made up of mandatory operational costs to acquire costs like insurance, as set forth by Colorado state law.

2.  Compliance Will Have a Chilling Effect on Rider Tipping

**66.**    Section 11(d) would be burdensome and have a chilling effect on rider tipping.  Uber would have to either create an entirely new screen flow for Colorado riders, or add all the required earnings information to the existing rating/tipping screen—the first screen that riders see after a ride—*see supra* ¶ 60—both of which would detract from the rider's experience and would be burdensome for Uber to redesign.  Calculating, pulling and presenting the required information would take about a dozen seconds.  Riders may not wait that long and may forget to tip or choose not to tip at all.  Further, Uber would have to disable multiple tipping options, including the option to tip while on trip, because it would be prohibited from providing an option to tip until the mandated information is available, and it is not until the trip is complete.

**67.**    In addition to the tip chilling effect caused by the latency, the Rider Facing Disclosure of Driver Earnings will require Uber to disable at least two of the tipping and rating screens currently available in Colorado because the screens would not support the Disclosures' display requirements.  The first tipping option that would be disabled is an option to trip while a trip is happening.  The other is a banner notification asking if the rider wants to tip, and which cannot accommodate the data required by the Act.  In short, Uber desires to speak to riders about tipping in two locations that the Act will prohibit.  And without these screens, users haveless touchpoints for tipping.  For example, some riders who would have usually tipped using the screens may not pursue other options to tip.

**68.**    The Rider Facing Disclosure of Driver Earnings presents unique challenges for UberX Share.  Compliance would mean that Uber would not be able to show any rider on an UberX Share trip the total amount of the driver's earnings on the UberX Share trip until the last rider is

dropped off, at which point the trip is complete.  Meaning, riders who were dropped off earlier on an UberX Share trip may not be presented with the option to tip for a significant length of time, which gives riders time to forget to tip altogether, and again depressing the frequency of tipping overall.

### C.  Driver Facing Disclosures:  Aggregated Mileage and Time Disclosures (TNC Act § 11(a)(III)–(IV)

69.    The Aggregated Mileage and Time Disclosure Requirements require Uber to disclose to its drivers at the time drivers receive an Offer Card:  "the aggregate estimated mileage that th[e] driver will drive during dispatch platform time and consumer platform time for the transportation task" and "the aggregate estimated time that the driver will spend during dispatch platform time and consumer platform time during the transportation task."  TNC Act § 11(a)(III)–(IV).

70.    What this means is that Uber has to provide *one* combined metric for the time to reach the consumer and the ride itself, and another combined metric for the miles to reach the consumer and the miles the ride itself will take.  By combining these metrics, Uber deviates from a current Offer Card format and reduces the information many Colorado drivers have about the different portions of a potential trip (*i.e.,* separates estimates for (a) how much time they have before they pick up a rider and (b) how much time the ride may take)).

71.    When a driver enters what the Act calls "available platform time," they may receive requests from riders looking for a ride.  Currently, drivers in Colorado and throughout the country are shown the terms of a ride or delivery via an in–app screen that Uber calls an "Offer Card."  There are two separate Offer Cards.  One contains time and mileage information but it separates out dispatch platform time and the consumer platform time, for time and

mileage.  Neither Offer Card shows aggregated time and aggregated mileage, making the mandated format entirely new and specific to Colorado only.  A driver can choose to accept or reject the ride after seeing the Offer Card.

72.     Uber prefers to present information about the length and duration of a ride in disaggregated form—*i.e.*, providing separate figures for time and miles it takes to reach a consumer, and separate figures for time and miles the ride itself will span—which provides drivers with more insight into the specific legs of a trip.  For example, drivers may want to understand how long they need to travel to the pick-up location compared to the length of the trip, and how long they will have a rider in their vehicle as opposed to being alone.  For these reasons, Uber wants to provide the time and distance for the period en route to the pickup separately from the time and distance from the pickup location to the final destination.

73.     Yet, the Aggregated Mileage and Time Disclosures compel Uber to speak in a way it otherwise would not.  To comply with the Aggregated Mileage and Time Disclosures, Uber has only two realistic choices: (1) it can remove the information that Uber believes drivers find helpful, and provide only the aggregated information compelled by the TNC, or (2) it can provide both aggregated and disaggregated information to give its consumers the information they want and also the less helpful information compelled by the law.

74.     This latter option would require Uber to design an offer card that is text-heavy and cluttered.  This would increase safety risks for drivers who receive Offer Cards when they are on the road.  This presents safety issues to drivers, who often parse and accept Offer Cards while on the road and while completing other rides, which is one of the reasons why Uber only provides information that is absolutely necessary for the driver to understand the scope of the ride.

75.     Additionally, disaggregated time and mileage information is more accurate for drivers, as riders may delay at pick-up or may change their pick up location, thus making the estimated total of time or mileage inaccurate.  By disaggregating these values, Uber is able to provide drivers more accurate information about which portions of the drive will include a rider.

76.     Complying with the Aggregated Mileage and Time Disclosure Requirement would change how Uber communicates to drivers now on the Offer Card in Colorado, and would require Uber to build at least one new offer card just for Colorado that risks distracting drivers with unnecessary, duplicative and unhelpful time and mileage information, or forcing it to silence the more helpful speech that it prefers to make to its driver customers.

### D.  DNC Act Offer Card Requirement (DNC § 3(a)(III)–(IV), DNC § 3(f))

77.     The DNC Offer Card Requirements require Uber to disclose to the driver "(III) The address or addresses where the food, beverages, or other goods must be picked up; (IV) The cardinal and intercardinal direction from where the driver is required to pick up the food, beverages, or other goods to the locations where the food, beverages, or other goods must be delivered" and to format the disclosure such that it is "(I) Prominently displayed on the screen or in the e–mail; (II) In a font that is at least one and one–half times larger than the font used to present any other information on the screen or in the e–mail; and (III) Presented using design techniques intended to draw the eye to the information."  (DNC § 3(a)(III)–(IV), DNC § 3 (f)(I)–(III).

78.     Colorado also specifically requires that Uber list all the addresses where the food, beverages, or other goods must be picked up.  That is the case even when the orders are "batched,"

meaning when multiple individual consumer orders are grouped together for an efficient delivery by one courier.  The requirements lead to screens that are cluttered and hard to decipher.

79.    These Requirements do not advance the DNC Act's stated purpose of transparency or driver protection, and are not user-friendly.  As with the Aggregated Mileage and Time Disclosure Requirements, loading a screen with too much and too dense and complicated information can confuse drivers and may distract users while driving. Most importantly, requiring Uber to alter its message to drivers and adopt the government's preferred manner for communicating information users rely on before deciding to accept a ride is compelled speech that does not pass constitutional muster.[33]

### E. Required Reporting Disclosures, Including IRS Mileage Deductions (TNC Act § 11(f)(III)–(IV))

80.    The Disclosure Requirements set forth in Section 11(f) alter the content of Uber's speech by compelling Uber to give inaccurate information and speak a message that is not its own—*i.e.*, to make tax calculations and to break out information in a way that is inconsistent with Uber's technology and approach.

81.    Under TNC section 11(f)(III) and (IV), Uber must disclose to drivers the time spent on Uber's digital platform in available platform time, dispatch platform time, and consumer platform time, and the miles driven during each period.  Under section 11(f)(V), Uber must also provide drivers with "[t]he total amount the driver may be entitled to deduct from income

---

[33] Notably, Colorado enacted a new law that prohibits drivers from holding/using mobile devices unless they have a hands-free accessory.  Concerning The Use of Mobile Electronic Devices When Driving A Motor Vehicle, S. 24-065, 74th Gen. Assemb. (Colo. 2024).  The Earner Facing Disclosures compel Uber to change its Offer Card and Rating Screen in ways that will lead to distracted driving, counter to this new law and public safety interests.

calculated using the IRS business mileage deduction rate for all miles known to the TNC to have been driven during . . . [a]vailable platform time, [d]ispatch platform time, and [c]onsumer platform time" TNC Act § 11(f)(III)–(V).  Further, staff for the CDLE have informed Uber that the disclosures required by TNC Act Section 11(f) cannot include time, mileage, or earnings that include metrics related to Uber's delivery platform.

### 1. Uber Does Not Currently Provide Tax Advice

**82.**    Uber does not currently provide tax advice to drivers that use Uber's mobility and delivery marketplaces.  Rather, it provides limited guidance consistent with its role as a service provider.[34]   Drivers are in charge of calculating and filing their own taxes and collecting the required information to ensure that their data entries are correct.

**83.**    Uber provides them with monthly and annual tax summaries, in addition to a 1099–K and 1099–NEC (where applicable).

### 2. Compliance With the IRS Disclosures Compels Uber to Provide Consumers with Inaccurate and Misleading Information.

**84.**    Compliance with these Disclosure Requirements would require Uber to alter its speech.  Uber is not a tax advisor.  It does not want to be compelled to wade into the provision of tax advice or federal tax information subject to change (such as IRS rates), nor calculate specific numbers for drivers to potentially deduct from their pay, which may be affected by different potential methods of expense calculation.

---

[34] *Tax responsibility for Uber drivers and couriers*, Uber, https://help.uber.com/en/driving-and-delivering/article/-tax-responsibility-for-uber-drivers-and-couriers?nodeId=4d959f38-520e-4387-8eab-c01454cc3744 (last visited Jan. 8, 2025).

85.    Further, only a driver knows their intent and purpose of the miles driven while in "available platform time," which drivers can enter by simply tapping a button in-app, regardless of their intent or desire to actually receive trip requests.  Drivers could be engaging in a number of non–Uber related tasks or simply have failed to turn off the App.  Notably, these Disclosure Requirements require Uber to make tax calculations that drivers could presumably make more accurately themselves because only a driver knows the purpose of the miles driven while being "online" on the Uber platform.  The law thus requires Uber to not only perform math for drivers but also to make speculative and potentially inaccurate representations to its drivers about their potential deductions and tax issues.

86.    Colorado has no interest in drivers receiving tax rate information, suggestions about deductibility, or math from Uber, especially in matters related to federal taxes.

3.    Uber Cannot in a Feasible Way Separate the Required Metrics Between Mobility and Delivery Platforms and Doing so Violates its Views.

87.    Defendants have informed Uber that the reports mandated by Section 11(f) cannot include any metrics related to time or mileage or earnings on the delivery platform.  Thousands of drivers in Colorado perform services on both the mobility platform and the delivery platform.  In other words, they may go online (available platform time) and seek out and perform requests for rides and also requests for transportation.  Uber makes both types of offers available through a single app, and its philosophy is to make both types of earning opportunities available to drivers who want them, to help them maximize their earnings.  Drivers can select whether they want mobility, delivery, or both types of opportunities.  For drivers who have indicated willingness to complete both mobility and delivery opportunities, Uber's technology does not differentiate between mobility and delivery for available platform time.  There is no feasible and reasonably

scalable way to separate out available platform time to delivery and not mobility, and doing so would require a cumbersome and difficult manual process. This approach also contradicts Uber's view that drivers may choose to perform both types of services and earn on both marketplaces.

### F. Courier Safe Path Disclosure (DNC Act § 6)

88.    DNC Section 6 states, "Each time a DNC connects a consumer to a driver, the DNC shall prompt the consumer as a means to encourage the consumer to ensure driver safety upon arrival, including by ensuring a clear, well-lit, safe delivery path and ensuring all pets are properly secured."

89.    Uber generally provides consumers awaiting delivery from couriers with options for consumers to help couriers find their doors with instructions or photos. Couriers are provided information about the dropoff location (e.g., "House") and dropoff type (e.g., "Meet at door"). Below is an example of such a screen.



**Figure 9**

90.     The Courier Safe Path Disclosure Requirement does not advance a compelling government interest and could result in less efficiency and safety for drivers.  That is because requiring Uber to add another disclosure—one that will not be relevant to many consumers (for example, those who do not have pets or do not need to turn on lights) risks alienating and overwhelming consumers with notifications.  Rather than paying attention to the relevant notifications, they may ignore notifications altogether.[35]  This decreases courier safety and the efficiency of the transaction overall.  The disclosure also takes up space in the eater app where Uber could otherwise communicate other messages of its preference.

---

[35] *See* Two Models of the Right to Not Speak, 133 Harv. L. Rev. 2359, 2372 (the surplus of internet speech creates "a problem of audience and attention scarcity."); *see also* Tim Wu, *Is the First Amendment Obsolete?*, 117 MICH. L. REV. 547 (2018) Available at: https://repository.law.umich.edu/mlr/vol117/iss3/4 ("The most important change in the expressive environment can be boiled down to one idea: it is no longer speech itself that is scarce, but the attention of listeners.").

V.     **The Disclosure Requirements Compel Uber to Express a Specific, Controversial Message and Espouse the Government's Views.**

91.     At bottom, The Disclosure Requirements compel Uber to adopt the State's view on controversial subjects such as Uber's share of a rider's payment in the gig economy and rideshare companies' and individuals' tax reporting responsibilities.  Adopting the State's viewpoint is not only improper content regulation that is harmful to Uber's business but it also will lead to confusion around issues that Uber has consistently sought to clarify to avoid misconceptions around driver earnings that tend to mislead drivers in a way that is harmful to them, including by keeping drivers from using the platform to earn profits

92.     If forced to comply with the Disclosure Requirements, Uber would be required to provide drivers with inaccurate information about their earnings and inaccurate information around their taxes, both of which are harmful to Uber.  Some examples of just how controversial rideshare companies, like Uber's, viewpoints on driver earnings and Service Fee can be:[36]

>     a.     Drivers themselves debate earning amounts and fees.  *See* @ uberman81, Reddit,                         https://www.reddit.com/r/uberdrivers/ comments/11x51s8/uber_takes_almost_half_of_our_pay/?rdt=45084 (last visited January 8, 2025) (comment thread discussing Uber fees and pass-through costs); *see        also        @*        armored_skier,        Reddit, https://www.reddit.com/r/uberdrivers/comments/18zgfoa/am_i_the_only_one_ma king_a_living_off_of_uber/ (last visited January 8, 2025) ("I get that earnings used to be better a few years ago, but earning right now, at least where I am, are liveable

---

[36] *Service Fee, explained*, Uber, https://www.uber.com/us/en/drive/driver-app/service-fee/ (last visited Jan. 8. 2025).

(sic).");        *See*        @        sassiecass33,        Reddit, https://www.reddit.com/r/uberdrivers/comments/vky7j6/what_does_the_service_f ee_adjustment_mean_when/ (last visited January 8, 2025) (screenshot from a user asking a question about service fee breakdown, with commenters explaining what the "service fee adjustment" line means).

93.    These examples illustrate how the Disclosure Requirements are controversial.  As relevant here, the information that the Disclosure Requirements compel Uber to provide are not commercial speech under First Amendment law and are non-factual and controversial information.  The government cannot explain how compelling inaccurate speech advances the Acts' purported goals of "transparency" or "protections for drivers" and thus, the Acts should be enjoined.

## VI.    The Act's Required Disclosures Are Burdensome

94.    In addition to their negative impact on the consumer experience by decreasing the clarity of disclosures and requiring Uber to redesign the App in ways that put driver safety at risk and misleads riders, the Disclosure Requirements are technically difficult to implement, expensive, burdensome on Uber's operations, and burdensome on Uber's speech.

95.    For example, the Aggregated Mileage and Time Disclosure Requirement and Driver Facing Disclosures of Total Rider Payment are driver–facing requirements that will significantly alter Uber's current driver disclosures.  These changes would require, at a minimum, redesigning in-app experiences, which increases the technical maintenance costs associated with Uber's mobility marketplace.

96.     As another example, the IRS Mileage Disclosure Requirements would require Uber to create a new operational structure to process metrics in ways that Uber has never done before.  At a minimum, this would require collaboration across several teams who would have to change their reporting mechanisms on driver mileage data in ways that, as explained above, serve to decrease accuracy rather than improve it.  And, even where Uber is able to make changes, engineering adjustments require bespoke efforts that are not manageable in perpetuity.

97.     These unconstitutional Disclosure Requirements raise the specter that other states will try to compel Uber to adopt their own government's viewpoints, on matters of what information is compelled, when it is compelled, and where it is compelled, and even the font size. The operational burden to Uber of creating and maintaining at least 50 different App configurations to satisfy each state's unsupported preferences cannot be overstated.

98.     Further, every surface on which Uber is compelled to speak the State's mandated message is a surface that Uber could present a different message or data point to its users. There is a finite amount of space on a smartphone screen. Every mandated disclosure pushes out a potential statement by Uber.

99.     Importantly, these burdens are not outweighed by any government interest articulated in the Acts.

## CLAIM FOR RELIEF

**COUNT I: Declaratory Relief and Preliminary and Permanent Injunctive Relief for Violations of the First Amendment to the United States Constitution (42 U.S.C. § 1983) As Applied**

100.     Uber re-alleges and incorporates by reference all allegations set forth in paragraphs 1–101 above.

101.    The First Amendment to the U.S. Constitution, applicable to state and local governments through the Fourteenth Amendment's Due Process Clause, protects the right to free speech, including the rights to not speak and to not express views which are not a person's own and with which a person disagrees.  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205, 210, 213 (2013).

102.    The First Amendment forbids the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *See Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972).  For this reason, the government cannot "compel a person to speak its own preferred messages," *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), as this "alter[s] the content of their speech."  The TNC and DNC Disclosure Requirements violate the First Amendment to the United States Constitution, as applied to Uber, because they are content based.  They are thus presumptively unconstitutional and subject to strict scrutiny.  *See Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 166 (2015) ("Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny.").

103.    The Disclosure Requirements prevent Uber from expressing its preferred message by mandating specific-government messages, even where Uber has already provided a message that is not misleading or harmful to consumers.  The Disclosure Requirements fail all levels of strict scrutiny because the government cannot prove they are "narrowly tailored to serve

compelling state interests." *Reed*, 576 at U.S. 163, 171 (noting it is the government's burden to do so). The government cannot prove, as it must, that the purported interest supposedly served by the Disclosure Requirements—"transparency—is a compelling one, at least as to Uber, or that it remedies any harm.

104.    The government also cannot show that the Acts regulate core commercial speech and are thus subject to intermediate scrutiny. Core commercial speech is speech that does no more than "propos[e] a commercial transaction." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563–64 (1980). This is speech that "merely advertises a product or service for a business purpose." *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996). The Disclosure Requirements regulate speech unrelated to any advertisement of Uber's products or services; they are not core commercial speech.

105.    And while compelled speech that is purely factual and uncontroversial may pass constitutional muster by a government showing that the speech is reasonably related to a substantial government interest and would not be unduly burdensome, none of that applies here. *See Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985)**.**

106.    As discussed *supra* ¶¶ 58–68, the Driver Facing Total Rider Payment and Rider-Facing Driver Earning's Disclosures are outside *Zauderer* because they require Uber to present earnings information in a misleading way. *See CTIA–The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 847 (9th Cir. 2019) ("We recognize, of course, that a statement may be literally true but nonetheless misleading and, in that sense, untrue."). Information about earnings and Uber's accuracy in reporting to users can be controversial, *see supra* ¶ 94 (media

excerpts describing how controversial rideshare companies, like Uber's, viewpoints on driver earnings can be and how important it is that Uber to remain true to its commitments as to transparency around its Service Fees).

107.    The Driver Facing Disclosures of Total Rider Payment (TNC Act § 11(b)) and the Rider–Facing Disclosure (TNC Act § 11(d)(II)) Requirements compel Uber to alter its current speech, by requiring it to share incomplete and misleading driver earnings and Uber Service Fee information with riders and drivers, and to do so immediately after a trip. Simultaneously, until it provides such information, the Requirements restrict Uber from communicating with or soliciting information from drivers and riders. These Requirements thus compel Uber to speak a specific government message *and* restrict Uber from speaking until it does so, making them content–based and subject to strict scrutiny.

108.    Both Disclosure Requirements fail all levels of scrutiny. The Driver Facing Disclosures of Total Rider Payment is not narrowly tailored to the State's alleged purposes of "transparency" and "driver protection," which are inadequate. The Rider–Facing Disclosure Requirement fares no better. Furthermore, there are less restrictive alternatives to both. For example, Uber already provides drivers with information about their earnings and Uber's Service Fees in receipts and weekly earnings reports and personalized in–App breakdowns.

109.    For similar reasons, the Driver Facing Disclosures of Total Rider Payment and the Rider-Facing Disclosure fail intermediate scrutiny. The State cannot meet its burden of showing that the disclosures "directly [and materially] advance[] [a substantial] government interest" or that they are not "more extensive than is necessary to further that interest." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566. As with strict scrutiny, "transparency" and "protecting drivers" are

too broad and nebulous to be substantial interests. *See U.S. West v. F.C.C*, 182 F.3d 1224, 1234–35 (10th Cir. 1999). And because the Driver Facing Disclosures do not remedy any real harm—since drivers already receive time, mileage, and earnings information—the State cannot prove that its interests are substantial.

110.     The State also fails *Zauderer* scrutiny because the Driver Facing Disclosures are "broader than reasonably necessary" to meet the State's interests and is "unduly burdensome." *Zauderer*, 471 U.S. at 651.

111.     Importantly, the **Display Requirements (TNC Act § 11(e))** that accompany both of these disclosures consist of vague requirements as to how Uber must alter the format in which it speaks its message—*e.g.,* "prominently" and—importantly, decreases driver safety because the required disclosures must be displayed on the drivers' screens in a way that is overly-distracting while they are on the road (*i.e.,* "presented . . . to draw the eye to the information"). These requirements are vague and fail all levels of scrutiny for the aforementioned reasons.

112.     The **Aggregated Mileage and Time Disclosure Requirements (TNC Act § 11(a)(III)–(IV))**, which require Uber to provide drivers with an Offer Card that displays aggregated estimates of trip duration and mileage, compel information that Uber prefers to provide to drivers in a different format. There is no explanation as to why aggregated mileage and time information, as opposed to disaggregated information advances the government's interest. The least restrictive alternatives here are clear: disaggregated disclosures.

113.     These Requirements also fail Intermediate and *Zauder* scrutiny for similar reasons. As with strict scrutiny, "transparency" and "protecting drivers" are too broad and nebulous to be substantial interests. *See West, Inc.*, 182 F.3d at 1234–35 (government cannot

"merely assert[] a broad interest" but "must specify the particular notion … and the interest served"). And because the Driver Facing Disclosures do not remedy any real harm—since drivers already receive time, mileage, and earnings information—the State cannot prove that its interests are substantial. As with strict and intermediate scrutiny, the State must show the Rider Facing Disclosure of Driver Earnings remedies a "real" rather than "hypothetical" harm. *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 777 (2018). It cannot do this because Uber already provides time, mileage and earnings information, making the disclosures "broader than reasonably necessary" and "unduly burdensome."

114. **The DNC Act Offer Card Requirement (DNC § 3(a)(III)–(IV), DNC § 3 (f))** requires Uber to alter its message to drivers and adopt the government's preferred manner for communicating information users rely on before deciding to accept a delivery. The government cannot demonstrate a compelling interest in loading drivers' cards with dense and complicated information in larger font size that can confuse drivers and may unnecessarily distract drivers. This provision fails all levels of scrutiny for reasons discussed at *supra* ¶¶ 105–107, 110–111 (discussing how driver facing disclosures lead to safety risks and government's inability to show they materially advance "driver protection" and "transparency").

115. **Reporting and IRS Disclosure Requirements (TNC Act § 11(f)(III)-(V) and DNC Act § 3(e)(I)(A))** compel Uber to provide tax advice and other reporting metrics, which it is not able to do because it cannot accurately calculate this information. For example, the TNC Act requires Uber to make a tax calculation: multiply the IRS business mileage deduction rate by all miles known to the TNC to have been driven during the driver's available platform time, dispatch platform time, and consumer platform time. Because Uber cannot accurately determine a driver's

intent and conduct during available platform time, this calculation risks being inaccurate. As such, it does not advance the TNC Act's stated purpose of increased transparency. On the contrary, the government cannot show that this requirement is narrowly tailored. Furthermore, there are less restrictive alternatives, such as the State communicating to people what federal rates are and how to do the multiplication, or allowing drivers to make calculations about tax deductions themselves or with the help of a tax consultant.

116.    Importantly, the TNC Act § 11(f)(III)(A) and (IV)(A) compel Uber to provide the available platform information, broken down between mobility and delivery, that it cannot accurately discern, and compel Uber to speak in ways that infringe upon its free speech rights, as explained above. The IRS Disclosure Requirements compel content–based speech that goes beyond proposing a commercial transaction, is potentially inaccurate tax advice, and is thus inherently controversial.

117.    For similar reasons, the IRS Disclosures fail intermediate scrutiny. As with strict scrutiny, "transparency" and "protecting drivers" are too broad and nebulous to be substantial interests. *See U.S. West*, 182 F.3d at 1234–35. And because the IRS Disclosures do not remedy any real harm—since drivers already have their own direct access to and in any event receive sufficient mileage information to complete their taxes—the State cannot prove that its interests are substantial. Further, the IRS Disclosures do not "directly and materially advance" the State's interests because they will require Uber to share speculative information with drivers, thereby reducing transparency and compromising driver safety. In fact, the State of Colorado has limited to no interest in federal tax matters.

118.    The State also cannot satisfy *Zauderer* scrutiny because it cannot show the IRS Disclosures remedy a "real" harm since Uber already provides information sufficient to allow drivers to calculate their own taxes, making the disclosures "broader than reasonably necessary" and "unduly burdensome."

119.    **Courier Safe Path Disclosure (DNC Act § 6)** compels Uber to prompt consumers with a specific message that Uber otherwise would not share.  This provision fails all levels of scrutiny.  First, the government cannot explain why this prompt is necessary and narrowly tailored to achieve the interests advanced by the DNC Act or that it even materially advances the purposes of "transparency" or "protecting drivers."  It is vague in its mandate that a DNC "prompt the consumer" to "ensure driver safety upon arrival."  The law does not explain how a prompt is to achieve this purpose.  The government also cannot explain how this provision is reasonably related to a substantial government interest because, as explained above,  "transparency" and "protecting drivers" are too broad and nebulous to be substantial interests.  To require Uber to comply with the Disclosure Requirements would infringe upon its First Amendment Right to free speech.

120.    There is a *bona fide* and actual controversy between Uber and Defendants because both Defendants are charged with enforcing the Disclosure Requirements, and have not expressed any intention not to do so, even though the Requirements violate the First Amendment to the Constitution.

121.    Uber maintains that TNC Act Section 11, and DNC Act Sections 3 and 6 and the Disclosure Requirements contained therein are illegal and unconstitutional and Defendants claim otherwise.

**122.**    Uber requests a judicial determination regarding the validity of the Disclosure Requirements to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of Uber's constitutional rights, which would occur if Uber were forced to comply with the Disclosure Requirements or have the Requirements applied against Uber.

**123.**    In light of the violation of the First Amendment to the United States Constitution, Uber seeks a temporary restraining order and a preliminary injunctive relief against enforcement of TNC Act Section 11 and DNC Act Sections 3 and 6 and the Driver Facing Disclosures of Total Rider Payment (§ 11(b)(I)–(III)); a Rider Facing Disclosure of Driver Earnings (§ 11(d)(II)); Aggregated Mileage and Time Disclosures (§ 11(a)(III)–(IV)); DNC § 3(a)(III)–(IV); DNC § 3(f) (together the "DNC Offer Card Requirements"); TNC Act § 11(e) ("Display Requirements"); TNC IRS Disclosures (§ 11(f)(III)–(V)) ("IRS Disclosures"), and DNC § 6 ("Courier Safe Path Disclosures").  Uber would be irreparably harmed if it were forced to comply with the Act, and the aforementioned Disclosure Requirements specifically, and has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Uber respectfully requests that this Court:

a.    Issue a temporary restraining order and preliminary injunction enjoining: TNC Act Section 11 and DNC Act Sections 3 and 6 , including the Driver Facing Disclosures of Total Rider Payment (§ 11(b)(I)–(III)); Rider Facing Disclosure of Driver Earnings (§ 11(d)(II));  Aggregated Mileage and Time Disclosures (§ 11(a)(III)–(IV)); DNC § 3(a)(III)–(IV); DNC § 3 (f) (together the "DNC Offer Card Requirements"); TNC Act § 11(e) ("Display Requirements"); TNC IRS

Disclosures (§ 11(f)(III)–(V)) ("IRS Disclosures"), and DNC § 6 ("Courier Safe Path Disclosures") including prohibiting enforcement by Defendants and their employees, agents, and successors, including but not limited to the Colorado Department of Labor and Employment as against Uber;

b.      Enter a judgment declaring that the Acts violate Uber's right to free speech and free  association under the First Amendment to the U.S. Constitution and that they cannot be applied against Uber;

c.      Award Plaintiffs costs, including reasonable attorneys' fees; and

d.      Grant such other and further relief as the Court deems just and proper.

Dated:  January 10, 2025

Respectfully submitted,

*s/ Frederick R. Yarger*

Frederick R. Yarger
Katie A. Reilly
Virginia M. Creighton
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone:   303.244.1800
Facsimile:    303.244.1879
Email:   yarger@wtotrial.com
            reilly@wtotrial.com
            creighton@wtotrial.com

WILLKIE FARR & GALLAGHER
LLP
Michael J. Gottlieb
Jeremy Bylund
1875 K Street N.W.
Washington , DC 20006-1238
Telephone:     202.303.1016
Email:   MGottlieb@willkie.com
            jbylund@willkie.com

WILLKIE FARR & GALLAGHER
LLP
Simona A. Agnolucci
Jonathan A. Patchen
Argemira Flórez
Alyxandra N. Vernon
333 Bush Street, Floor 34
San Francisco, CA 94104
Telephone:  415.858.7400
Email: SAgnolucci@willkie.com
            jpatchen@willkie.com
            aflorez@willkie.com
            avernon@willkie.com

Attorneys for *Uber Technologies Inc.*