UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:25-cv-00096-DDD-KAS

UBER TECHNOLOGIES, INC.

      Plaintiff,

v.

SCOTT MOSS, Director of the Division of Labor
Standards and Statistics, in his official capacity.

      Defendant.

---

## PLAINTIFF'S AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Plaintiff Uber Technologies, Inc. ("Uber"), brings this Complaint for declaratory and injunctive relief, and alleges as follows:

### INTRODUCTION

1.      One Colorado law—SB24–075 ("TNC Act" or "Act") (codified at Colo. Rev. Stat. § 8–4–127), and specifically, for purposes of this action, provisions in section 11 of the TNC Act—imposes an unprecedented and unconstitutional regime of both compelling and prohibiting certain speech on transportation network companies, like Uber. The law contains disclosure requirements that prohibit Uber from speaking until Uber conveys the State's preferred message; compel Uber to speak in specific ways down to time, content, and font; and alter Uber's speech, in a way that would contradict Uber's expressive choices. Nor can the Act withstand scrutiny. Even under the most generous reading, it does not further any legitimate state interest.

**2.** The Act does not just compel speech; it compels Uber to shout the State's message. Portions of the Act go so far as to demand that Uber "prominently display[]" the speech "[i]n a font that is larger than the font used to present any other information on the screen" *and* "using design techniques intended to draw the eye to the information." TNC Act § 11(e)(I)-(III). Worse, the message that the State wants Uber to shout is incomplete, misleading, and likely to cause reputational harm to Uber. The Act is unlike any other and constitutes a deep invasion by the State into the content, screen-flow, look and timing of a company's smartphone application, down to the font size. In fact, two provisions of section 11 in the TNC Act compel Uber to express the State's viewpoint that Uber does not sufficiently compensate its drivers (*i.e.,* earners), a controversial and inaccurate message Uber cannot be compelled to express without offending core First Amendment principles. The State has effectively conceded this, explaining in its Opposition to Preliminary Injunction that the disclosures "enable" drivers and riders to decide "which TNC best aligns with their values."[1]

**3.** The Court should not countenance any suggestion that the Act is narrowly tailored to achieve a compelling state interest or that there are no less restrictive alternatives that would serve the State's purpose. The TNC Act does not define "transparency" or "protections for drivers," which on their own are far too broad and nebulous to be compelling interests. Yet, the State thinks it can compel Uber to speak its message to achieve these vague purposes. Uber brings

---

[1] *See* Scott Moss's & Jared Polis's Opposition to Motion for Preliminary Injunction at 12, Dkt. 29; see also Dkt. 29-1 (testimony prior to Act's passage explains the Act "empowers consumers … to make informed decisions about where [their] money goes").

this action for declaratory and injunctive relief because the Act must be enjoined as unconstitutional to prevent constitutional harm to Uber.

4.       The TNC Act applies to transportation network companies and primarily consists of two parts, one relating to deactivation and suspension procedures and the other relating to what the TNC Act calls "transparency for drivers and consumers." Uber's challenges now are to provisions of Section 11, which require Uber to electronically disclose certain information to drivers and riders beginning on February 1, 2025.

5.       The extent of regulation in the Act is unprecedented. It subjects transportation network companies,[2] like Uber, to statutory damages in the amount of *one thousand dollars* on a per-consumer or per-driver basis, plus an additional one hundred dollar penalty, if they violate any of the Act's technicalities.[3] Thus, if Uber does not calculate tax deductions for independent third parties (one of Section 11's requirements), because, as is the case for Uber, it is not certified to give tax advice, Uber could be liable for excessive and unconstitutional statutory damages and civil penalties. These are just a few of the many examples of the extreme effects that could result from the execution of the overzealous Act.

6.       The Act authorizes the director of the Division of Labor Standards and Statistics or his or her designee with enforcement, including by imposing penalties. *See* Colo. Rev. Stat. Ann.

---

[2] Defined as "a corporation, partnership, sole proprietorship, or other entity, operating in Colorado, that uses a digital network to connect riders to drivers for the purpose of providing transportation." C.R.S.A. § 40-10.1-602 (3). And with the stated exclusions in TNC Act §(1)(q).

[3] TNC Act § (13)(a)(I) and (13)(a)(II).

§ 8–4–101; C.R.S.A § 8–4–127(13).  The penalties and enforcement mechanisms are extensive.
*See* TNC Act § (13).

7.      Uber has willingly and in good faith engaged with regulators in Colorado and across
the country to try and promote regulations that promote important goals like consumer and driver
welfare and safety.

8.      But "whatever the challenges of applying the Constitution to ever-advancing
technology, the basic principles" of the First Amendment "do not vary."  *Brown v. Ent. Merchs.
Ass'n.*, 564 U.S. 786, 790 (2011) (quotations omitted).  Where novel regulation infringes upon the
First Amendment's rights of free speech and the State cannot meet its burden under the law to
justify such infringement, as is the case here, then the law must give way to Uber's constitutional
rights.

9.      Uber is a technology company that operates in Colorado, and throughout the United
States, two technology-enabled marketplaces, one for mobility and one for food and other
merchandise delivery (collectively "marketplaces").  This case implicates Uber's mobility
platform.  And, specifically, Uber's speech to Colorado consumers, both drivers and consumers,
who use the platform thousands of times daily, which the Act seeks to regulate.

10.      Uber's mobility marketplace connects both individuals who are looking to earn
money by providing transportation services on their own schedule, and individuals who are
looking to obtain such transportation services.  Uber's delivery marketplace connects merchants
like restaurants, with consumers seeking delivery services, and individuals looking to earn money
by completing deliveries on their own schedules.  Both marketplaces provide millions of drivers
(*i.e.,* earners) with the opportunity to earn income by providing those services.

11.    Each day, through Uber's rideshare and delivery platforms, Colorado's independent drivers are connected with riders who request rides and/or consumers who request the delivery of meals, groceries, and more, primarily through its driver–facing and consumer–facing smartphone applications ("Uber App" or "App").[4]  In so doing, Uber is part of a dynamic market and competes vigorously for drivers' and consumers' attention including by providing its services in a way that builds (and keeps) driver and consumer trust and protects their safety.

12.    Uber endeavors to provide consumers and drivers with a seamless and frictionless experience while also providing the information they want and need at a time and place where it is useful and helpful to them.  Simultaneously, Uber does not overload them with information that they do not want or need.  Uber's decisions about what information to share and when are tailored to its platform to promote safety, privacy, reliability, quality, and a positive driver and consumer experience.

13.    Colorado legislators claim to have drafted the Act to address a purported need for "transparency," including disclosing "how much money [is] going to the [transportation network] company" and "how much money's going to the Driver."[5]  But the Act does not mandate disclosure of "how much money [is] going to the [transportation network] company"; in fact, it compels Uber to misleadingly juxtapose driver earnings and rider price in a manner that implies Uber takes more than it actually does.

---

[4] Uber's technology platform is accessed primarily through three apps: (1) Earner App - accessed by persons conducting earner rides and deliveries; (2) Rider App - accessed by consumers seeking rides; and (3) Eater App - accessed by consumers seeking food through Uber Eats.

[5] Dkt. 29-1 (testimony from Senator Rodriguez, the Act's sponsor).

14.    The Act is further meant to "protect drivers" engaged with transportation network companies, like Uber.[6] Uber, however, already strives to provide drivers with accurate and clear information that allows drivers to decide whether to continue using the platform. As a result, Uber has aimed "to provide [its] users — drivers, couriers, merchants, and their customers — with transparency around how the platform works, including how prices are formulated."[7]

15.    The Act's Driver Facing Disclosures of Total Rider Payment (§ 11(b)(I)–(III)); Rider Facing Disclosure of Driver Earnings (§ 11(d)(II)); Aggregated Mileage and Time Disclosures (§ 11(a)(III)–(IV)); TNC Act § 11(e) ("Display Requirements"); and TNC IRS Disclosures (§ 11(f)(III)–(V)) ("IRS Disclosures"), (hereinafter, referred to collectively, as ("Disclosure Requirements")) compel Uber to alter the content of its speech to drivers and riders and are, therefore, presumptively unconstitutional and unjustifiable. Specifically, the Disclosure Requirements compel Uber to speak the State's preferred message and to the State's preferred audience and at the State's preferred time, prohibit Uber from speaking until it does so, and in some cases, require Uber to alter and undermine its own reputation and its own its speech on controversial issues important to its business in a way that is incomplete, misleading, and likely to cause harm to Uber.

16.    Accordingly, Uber seeks declaratory relief, a temporary restraining order and preliminary and permanent injunctive relief on the grounds that the Act violates Uber's free speech

---

[6] S.B. 24-075, 74th General Assembly (2024) (enacted).

[7] Miriam Chaum, *Understanding Upfront Fares,* Medium (April 28, 2023), https://medium.com/uber-under-the-hood/understanding-upfront-fares-491cbaf975d6#:~:text=Introducing%20Upfront%20Fares%20for%20drivers,enough%2C%20they%20can%20decline%20it.

rights under the First Amendment to the United States Constitution.  Uber seeks to vindicate the deprivation of constitutional rights under the color of state statute, custom, and/or usage.  Uber is also entitled to attorneys' fees and costs if it prevails on any of its § 1983 claims.  *See* 42 U.S.C. § 1988.

## THE PARTIES

17.     Plaintiff Uber is a Delaware corporation with its principal place of business in San Francisco, California.

18.     Defendant Scott Moss is the Director of the Division of Labor and Standards and Statistics, and is sued here in his official capacity.  As Director, Mr. Moss is charged with enforcing the Act, including the provisions complained of herein.  *See* TNC Act § (2)(b)(II), § (13); Colo. Rev. Stat. Ann. § 8–4–101(3).

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over Uber's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. § 1983 because Uber alleges violations of its rights under the First Amendment to the U.S. Constitution.

20.     The Court may award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2022, as well as any other equitable relief it deems appropriate under its inherent powers.

21.     Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b)(1) because Defendant is located within this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Uber's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.    Uber Values Safety and Transparency

22.    Person–to–person connections are at the foundation of Uber's business, putting safety, efficiency, and reliability at the core of Uber's mission.  Uber operates on a global scale and believes both safety and satisfying both its drivers' and consumers' needs are paramount to the success of its marketplaces.  Accordingly, a fundamental tenet of Uber's mission is to make safety "a top priority every single day" and "embed [it] into everything we do."[8]  Uber prioritizes driver and rider safety in its mobility marketplace.

23.    Uber makes this commitment to safety clear to the public by stating that the company "care[s] deeply about the safety of the millions of people using our platform," that "[s]afety is embedded in [Uber's] cultural values," and that it is committed to "safety and transparency" because "secrecy doesn't make anyone safer."[9]

24.    In order to convince drivers—who have a variety of other earning opportunities available to them—to use the Uber platform, and to address substantial misunderstanding, Uber is also transparent with its drivers as to the consumer price, third-party fees, taxes, operational expenses, and Uber's Service Fees.[10]

---

[8] *Values,* Uber, https://www.uber.com/us/en/careers/values/ (last visited Jan. 2, 2025).

[9] *2021-2022 US Safety Report*, Uber, 3, 12, 22, https://uber.app.box.com/s/lea3xzb70bp2wxe3k3dgk2ghcyr687x3?uclick_id=7b682b1a-ca30-4310-b88c-e7d072cd23fc (last visited Jan. 2, 2025).

[10] *Service Fee, Explained*, Uber, https://www.uber.com/us/en/drive/driver-app/service-fee/ (last visited Jan. 10, 2025).

**II.    Uber's Service Fees and Misconceptions**

25.     Drivers pay Uber an amount, called a Service Fee, on completed trips.  Following a ride, drivers can see how much they pay in Service Fees in their ride receipts, online dashboards, and weekly statements, *see infra* ¶¶ 50–53.  Drivers can also see a breakdown of their earnings in those locations.  These breakdowns provide drivers with important context about how much they are earning versus how much they pay Uber in Service Fees.

26.     Service Fees are variable and are not a fixed amount or a fixed percentage fee.  Having variable Service Fees helps Uber make less desirable routes appealing enough to drivers to compete and ensure riders in need of such trips have a positive marketplace experience.[11]  Trips with higher service fees help allow Uber to price other trips at lower amounts that help make rides more affordable for more people, which creates more opportunities for drivers.  Because Service Fees are variable, looking at the Service Fee on one trip can be misleading as to Uber's practices generally.

27.     The Service Fee that drivers pay Uber is not the only amount that makes up the difference between what a rider pays, and a driver's earnings.  There are also things like road, tunnel, and bridge tolls, mandatory insurance that Uber maintains on behalf of drivers, and other government-mandated taxes.[12]

28.     As an example, Colorado has since mid-2022 imposed a "prearranged ride fee" on transportation network companies, such as Uber, for prearranged rides requested and accepted

---

[11] *How Can Pricing Serve Riders and Drivers*, Uber, https://www.uber.com/us/en/marketplace/pricing/service-fee/ (last visited Jan. 8, 2025).

[12] *Service Fee, Explained*, Uber, https://www.uber.com/us/en/drive/driver-app/service-fee/ (last visited Jan. 8, 2025).

through a digital network operated by the transportation network company, with transportation network companies being responsible for filing a return with and paying the prearranged ride fee.[13]

29.      In Colorado, Uber must obtain insurance for each driver in the amount of $200,000 per person and $400,000 per occurrence for damages caused by uninsured motorists.[14]  Insurance costs in Colorado are significantly higher than in certain other states. Uber covers these mandatory insurance costs, including in Colorado, through a fee charged to riders called the "Booking Fee."[15]

30.      There can be a misconception among users that Uber retains the entire difference between what a rider pays for a trip and what a driver retains as earnings for the trip, which is not accurate.  To try to help drivers understand Uber's Service Fees and the other elements that make up the difference between rider prices and driver earnings, Uber provides detailed fare breakdowns.  For example, take a ride receipt that informs the driver the rider price for the trip was $14.38, and the amount the driver earned pre-tip was $6.06 **(Figure 1 below)**.  If Uber did not provide a fare breakdown, it would seem like Uber charged the driver $8.32 in connection with the ride.  But as **Figure 1** shows, $2.24 of the amount Uber received is for insurance that Uber pays on behalf of the driver.  This context is important for drivers to understand how much they are actually paying Uber to use Uber's platform, and to avoid false impressions.

---

[13] *Prearranged Ride Fee*, Colorado Department of Revenue (July 1, 2022), https://tax.colorado.gov/prearranged-ride-fee.

[14] Rideshares And Uninsured Motorist Insurance Coverage, H.R. 22-1089, Gen. Assemb., Reg. Sess. (Colo. 2022), available here https://leg.colorado.gov/sites/default/files/2022a_1089_signed.pdf.

[15] *Booking Fee*, Uber, https://help.uber.com/en/riders/article/booking-fee?nodeId=ab5837e4-8f55-442c-9894-15c1d4131fe9 (Jan. 8, 2025).



**Figure 1**

**31.** Because drivers are Uber's customers, and Uber vigorously competes for their business, it is very important that drivers understand the relationship between their earnings and the Service Fee Uber charges, as well as the costs that are imposed by the State, such as for government fees and high-limit insurance. That is, that drivers understand the fee is reasonable in proportion to the service performed. Fare breakdowns help provide this context and ensure drivers understand the percentage that Uber actually retains and where the rider price actually goes.

**32.** In order to help drivers and riders understand the charges and costs associated with use of its platform, Uber provides information on its website that breaks down "where the customer price goes" and points to where drivers can "check the service fee each week" which discloses "a

detailed breakdown of rider payments and what goes to commercial auto insurance, city/region fees, tolls, and airport surcharges . . . [and] the amount Uber takes to keep the app running and improving."[16]  Uber has also launched campaigns to better explain its pricing models and their changes over time through different mediums, such as blogs,[17] and campaigns like the Effective Commission Rate ("ECR") media campaign, to give drivers' insight into Uber's Service Fee and the myriad factors that influence it and others components.  The campaign was launched online through media outlets like Spotify, Instagram, and Meta.  Part of this campaign included a website with a comprehensive overview of the kind of earnings information available to drivers, as well as paid media in 21 cities across the U.S.  Through this campaign Uber reached over 800,000 drivers in the U.S. In addition to this campaign, Uber provides other access points for finding this type of data on the platform.[18]

### III.    Uber Prioritizes Safety in its Product Design

33.    Uber also makes its commitment to safety clear to the public by how "[s]afety is designed into the experience"[19] and its stated values of making Uber "safer for everyone using our

---

[16] *Service Fee, Explained*, Uber, https://www.uber.com/us/en/drive/driver-app/service-fee/ (last visited Jan. 8, 2025).

[17] Miriam Cahum, *Understanding Upfront Fares,* Medium (Apr. 28, 2023), https://medium.com/uber-under-the-hood/understanding-upfront-fares-491cbaf975d6#:~:text=Introducing%20Upfront%20Fares%20for%20drivers,enough%2C%20they%20can%20decline%20it;  *Tracking Your Earnings*, Uber, https://www.uber.com/de/en/drive/basics/tracking-your-earnings/ (last visited Jan. 8, 2025). In addition to the general information available as part of this campaign Uber offers drivers individualized fare breakdowns available in-app and on its website.

[18] This specific campaign is currently only for drivers who only do rideshare trips.  Those who do both deliveries and rides currently rely on the weekly statement.

[19] *Your safety drives us*, Uber, https://www.uber.com/us/en/drive/safety/ (last visited Jan. 3, 2025).

platform."[20]  Uber also displays its commitment through its engagement on safety issues in the community.  For example, Uber created a Safety Advisory Board in 2015 that helps ground its approach to safety in "advice [Uber] receives from safety experts and advocates."[21]  The Board advises Uber how to "enhanc[e] safety" by means of its policies and processes.[22]

34.    Uber communicates and lives its dedication to safety in numerous ways, including through its industry-leading Safety Report,  and through its Community Guidelines.  Uber's publicly available Community Guidelines apply to the drivers, riders, and consumers who use Uber's platform.  These Guidelines focus on three tenets: treat everyone with respect, follow the law, and help "keep one another safe."[23]  The Guidelines note that Uber is "hard at work every day to help create safer experiences for everyone."[24]  These tenets guide how Uber builds and executes its business.  Uber "build[s] [its] technology with [driver] safety in mind" and in consultation with law enforcement to create specific driver safety tips to keep drivers safe while driving with

---

[20] *Values*, Uber, https://www.uber.com/us/en/careers/values/ (last visited Jan. 9, 2025).

[21] *Uber's Safety Advisory Board,* Uber, https://www.uber.com/us/en/safety/safety-advisory-board/?uclick_id=971c38ca-3a88-4c99-89b6-a3259d255f67 (last visited Jan. 3, 2025).

[22] *Id.*

[23] *Uber's Community Guidelines*, Uber, https://www.uber.com/us/en/safety/uber-community-guidelines/ (last visited Jan. 2, 2025).

[24] *Uber Community Guidelines*, Uber (Nov. 19, 2024), https://www.uber.com/legal/en/document/?name=general-community-guidelines&country=unitedstates&lang=en&uclick_id=12b99a8b-7b8b-4694-89df-ed092e6d41cb (Uber's full Community Guidelines).

Uber.[25]  These tips encourage drivers to "[s]tay[] focused on driving" and do what they can to "help reduce dangerous distractions" while on the road.[26]

35.    Uber designs its App to promote efficient and frictionless experiences that promote safety for drivers while on the road.  Part of that design requires creating screenflows that allow drivers to engage with information that is useful for them to decide whether or not to accept a trip request, how to complete their ride while remaining safe on the road, and how to maximize their earnings.  From a safety standpoint, choosing when and how to provide information to drivers is a critical consideration, so that drivers are not overwhelmed with too much information or unnecessary distractions while on the road.  Uber addresses this need by being mindful of screenflow formatting such as font sizes, and how much information is available to drivers at a time.

## IV.    The Act's Required Disclosures Violate the First Amendment

### A.    *Driver Facing Disclosures of Total Rider Payment (§ 11(b)(I)–(III))*

36.    TNC Section 11(b) requires Uber to electronically disclose to drivers on a single screen on the app: (I) the total amount of money that the rider paid for the transportation task, before any tip was added; (II) the total amount of money paid to the driver for the transportation task before any tip was added, excluding "pass-throughs," if any; and (III) the amount of the tip, if any.  Section 11(b) also has an important and problematic timing component–Uber must display the single screen containing all of this information when the driver resumes what the Act calls

---

[25] *Prioritizing Safety While Driving with Uber*, Uber,
https://www.uber.com/us/en/drive/safety/tips/ (last visited Jan. 2, 2025).

[26] *Id.*

"available platform time" after completing a transportation task, *i.e.*, once the driver ends a trip and then remains online and available to receive another trip request.

37.    The Disclosures also have formatting requirements for how this information is presented: it must be "prominently displayed on the single screen on the digital platform or in the email"; "[i]n a font that is larger than the font used to present any other information on the screen or in the e-mail; and [p]resented using design techniques intended to draw the eye to the information." TNC Act § 11(e)(I)-(III).

        1.  <u>The Driver Facing Disclosures of Total Rider Payment Create Safety Risks.</u>

38.    This novel requirement will create significant safety risks because it will disrupt and slow down post-trip processes and will require Uber to provide drivers with misleading and distorting information about their earnings and Uber's Service Fee on a "single screen" immediately after they complete a ride.

39.    Previously, after the ride was completed—that is, after the rider was dropped off at their destination—the first screen drivers saw was a "Rating Screen" that allowed them to rate the rider on a scale of one to five stars, by simply tapping their selected number of stars. It had fewer than ten words, including the rider's first name. Below is an example of this screen.



**Figure 2**

40.     Drivers' ratings of riders, and riders' rating of drivers, has been a core feature of the Uber mobility marketplace for a long time. Mutual ratings allow drivers and riders to gather basic reputational information about each other when deciding to accept a trip request or a ride. They facilitate accountability and behavior that complies with Uber's Community Guidelines, and they promote safety. Uber also uses the ratings for various safety-related purposes and to protect and improve all users' experiences.

41.     The same is true for "UberX Share Rides"[27] or multiple rider and dropoff rides. Drivers rated riders once the last rider is dropped off. Below is an example of this screen.

---

[27] *UberX,* Uber, https://www.uber.com/us/en/ride/uberx/ (last visited Jan. 10, 2025).



**Figure 3**

42.     Uber provided this screen immediately after the completion of the Share ride, and without interruption, so that its design was aligned with its guidance to drivers to "[s]tay[] focused on driving" and "giv[e] [Uber] feedback" by rating riders to help Uber improve its drivers' experiences and overall services.[28]  This made it easy for drivers to efficiently transition towards what they are most interested in, the next earning opportunity.  It also served both short-term safety by presenting a simple and easy to use screen and long-term safety, by facilitating ratings and accountability.

43.     The Driver Facing Disclosures of Total Rider Payment compel Uber to communicate inaccurate earnings and Service Fee information by requiring Uber to juxtapose, immediately post trip and "on a single screen," "[i]n a font that is larger than the font used to

---

[28] *Prioritizing safety while driving with Uber,* Uber,
https://www.uber.com/us/en/drive/safety/tips/ (last visited Jan. 9, 2024).

present any other information on the screen," "[t]he total amount of money that the consumer paid for the transportation task before any tip was added" and "[t]he total amount of money paid to the driver for the transportation task before any tip was added, excluding pass-throughs, if any." TNC Act § 11(e)(I)-(III) and 11(b)(I)-(II). Importantly, this set of metrics cannot accurately describe what Uber charges as a Service Fee or what accounts for the difference between the rider's payment and the driver's earnings. Rather, it is designed to promote the State's message that drivers are insufficiently compensated.[29]

44.    To attempt to counter any confusion around what drivers receive and what Uber takes from each ride, at the time of the compelled speech, the new requirement forces Uber to provide drivers with additional complex information, while they are often still driving. Such information includes information about Uber's Service Fee, and other fees that make up the difference between what a rider pays, and a driver's earnings, like bridge tolls and government-mandated taxes, *see supra* ¶¶ 26–30. Additionally, it takes Uber approximately 14 seconds to present the mandatory information to drivers—whereas the rating screen was presented immediately. This information lag increases the risk of safety incidents.[30] This is precisely the

---

[29] *See supra* note 1.

[30] *See, e.g.,* Department of Transportation, National Highway Traffic Safety Administration, Notice of Federal guidelines, https://www.federalregister.gov/documents/2013/04/26/2013-09883/visual-manual-nhtsa-driver-distraction-guidelines-for-in-vehicle-electronic-devices (Apr. 26, 2013) ("The NHTSA Guidelines recommend that devices be designed so that tasks can be completed by the driver while driving with glances away from the roadway of 2 seconds or less and a cumulative time spent glancing away from the roadway of 12 seconds or less."); *2-Second Rule for Distracted Driving Can Mean Life or Death*, NYT, Sep. 27, 2018 ("The odds of a crash double if your eyes are off the road for more than two seconds," said Wade Newton, a spokesman. Just two seconds can be the life-or-death difference between hitting that metalstrip, or a deer, and avoiding it.");

type of risk Uber designs its products to avoid in an effort to increase driver safety. For example, while Uber makes available earnings information through the app (*e.g.*, in a section called the Earnings Hub drivers can access when they want to), Uber did not push earnings information to drivers immediately post-trip. Doing so disrupts and potentially cause delay in the driver's receipt and understanding of the next trip offer and overloads the driver with complex information at a potentially unsafe time, when the driver may be on the road. Further, Uber encourages drivers to "[s]tay[] focused on driving" and do what they can to "reduce dangerous distractions" and does not overload them with information while they are driving to help them do so.[31]

    **45.**    It is not feasible for Uber to have different mandatory screen flows for each state due to the required level of engineering efforts and ongoing maintenance. Additionally, every time Uber adds significant information to a screen, pulled from multiple sources, the risks of in-app glitches and issues rises, forcing Uber to spend more resources working to prevent those issues.

    2.    <u>The Driver Facing Disclosures of Total Rider Payment Will Create Confusion and Promote Misconceptions Around Driver's Earnings.</u>

    **46.**    The Driver Facing Disclosures of Total Rider Payment undermine Uber's ongoing efforts to communicate to drivers, riders and the public clarifying context about Uber's Service Fees to drivers by requiring it to present earnings information in a way that causes drivers to think that Uber is taking more from the ride than is accurate. Uber has limited time to communicate with drivers while they are on the platform. As such, when it is able to speak to drivers about their

---

*Distracted Driving*, GHSA, https://www.ghsa.org/issues/distracted-driving (last visited Jan. 9, 2025).

    [31] *Prioritizing safety while driving with Uber,* Uber, https://www.uber.com/us/en/drive/safety/tips/ (last visited Jan. 9, 2025).

pg 20 of 48

earnings, it seeks to do so in an accurate way that does not perpetuate misconceptions about Uber's revenues as compared to drivers' revenues. The Driver Facing Disclosures of Total Rider Payment compel Uber to use the limited time it has to communicate, to express a viewpoint mandated by the State and implicating the sufficiency of driver compensation in a misleading manner. This precludes Uber from sharing the content it wishes to share until it has shared the State's required message.

47.    The State's message is evident by the cherry-picked figures it requires Uber to disclose to a driver immediately after the ride—a rider's pay and a driver's fare earnings, excluding pass-throughs. As the State effectively concedes, this is intentionally meant to imply that Uber insufficiently compensates drivers, and this limited view is thus meant to promote the misconception amongst drivers and the general public that Uber takes the difference between those figures. In fact, the difference between what a rider paid and what the driver earned does not account for tolls paid by the rider and transmitted back to the driver as part of their weekly toll reimbursements,[32] government mandated fees and taxes that Uber collects and transmits to the State, or the Booking Fee, which is an amount that the rider pays and which covers state-mandated insurance that Uber procures on drivers' behalves. For example, if a ride costs $24 and a driver earns $16, without proper context it appears like Uber made $8 in revenue, but it is not that simple.

48.    The State designed these disclosures to shame Uber as to driver earnings by making them appear smaller than what they are, relative to Uber's revenues. It does this in substance, by limiting what a driver sees, and in form by requiring that this be the information that is displayed

---

[32] *How are tolls paid?*, Uber, https://help.uber.com/driving-and-delivering/article/how-are-tolls-paid/?nodeId=55942c9a-675a-4808-b498-ae33754e7183 (last visited Jan. 9, 2025).

"prominently" and "in a font that is **larger than** the font used to present **any other information,**" and at a time and place that does not allow Uber to meaningfully counteract the State's mandatory and misleading communication. *See* TNC Act § 11 (e)(I)–(III) (emphasis added).

49.     The State's purpose of shaming Uber is made clearer by the fact that Uber *already* provides drivers with numerous options for accessing accurate earnings information, in a time and place that is safe and useful because it allows for meaningful context, *see supra* ¶¶ 26–30.  For example, Uber provides drivers with information about their earnings, after the ride ends in at least three ways.

50.     First, drivers can check the ride receipt, which is available to them in their Uber Application, the Uber web portal, and via email.  This receipt contains a robust set of metrics, including (1) earnings (with a breakdown of fare and tip, if any); (2) ride duration; (3) ride distance; and (4) Uber's service fee summary, which contains a breakdown of all relevant components.  Below is a true and correct copy of a driver's receipt illustrating the aforementioned breakdown, among others:



**Figure 4**

51.     Second, drivers can access information, including earnings, about their ride by using their driver dashboards on a web browser at drivers.uber.com.  The dashboard includes information like rider pay and tip in aggregated form.



**Figure 5**

52.     Third, drivers can expect to receive information about their earnings from Uber in
a weekly earnings report, which is sent to them weekly.  Also available to them weekly is a
personalized in–app breakdown showing how their earnings were broken out, and reflecting costs
like insurance, and other state–mandated costs that Uber takes into consideration when issuing its
fees.  This personalized in–app breakdown was launched as part of Uber's ECR campaign, *see
supra* ¶ 32.   Below is an example of this personalized in–app breakdown.



**Figure 6**

53.    Below is an excerpted and highlighted example of a weekly earnings report.  This

report provides drivers with their total earnings, pass-throughs, and a summary of total consumer

pay in aggregated form, with the option to drill down on amounts transferred to the driver's bank

account for specific transactions.  It also provides a breakdown of drivers' Service Fees—the

amount Uber charges to use the platform, and Booking Fees.  It further explains insurance issues,

regulatory–related charges, and other helpful information.







**Figure 7**

54.     As Figures 4–7 show, there is no need for the Driver Facing Disclosures of Total Rider Payment, and its only purpose is to shame Uber.  Further, Figures 4–7 demonstrate that information about earnings and Uber's Service Fees requires fulsome context to be complete and useful to drivers.  Because Uber believes context is important when providing earnings breakdowns, in order for Uber to both comply the with TNC Act's disclosure requirement and provide the information it believes is necessary for drivers to have the appropriate context, Uber would need to add the lengthy context already present in the drivers' receipts and earnings reports to a small mobile screen.  This  is not possible to do in a way that allows for full context and would result in Uber redesigning its Rating Screen in a way that is text–heavy, inefficient, and will increase the risk of driver distraction on the road.



**Figure 8**

26

55.    Disclosures are text-heavy because Uber must include earnings breakdowns about pass-throughs and other relevant fees for a driver to understand their total earnings post-ride.  Text-heavy disclosures on the first screen drivers see post-ride (Rating Screen) are not  effective to convey all the information that Uber wants to convey to provide a full picture, and in any event, distract drivers when they are on the road.  Relatedly, the smaller user-interface font that would be necessary to display all the required information is harder to read than the earnings information available to drivers in their ride receipts, webpage and in-App dashboard, or weekly earnings report, and must be smaller than the components that the State has mandated by larger than anything else.  This Disclosure Requirement forces Uber to prioritize the State's preferred message about drivers' earnings in a time, place and manner over Uber's own message.

56.    This distorted message does not advance the Act's purported goal of disclosing "how much money [is] going to the company" and "how much money's going to the Driver."[33]

57.    Finally, to comply with the Driver Facing Disclosure of Total Rider Payment, Uber not only has to share speech in a specific time and manner, it cannot communicate with or solicit information from drivers about that ride until it provides the specific information mandated by section 11(b).  Thus, the inevitable result is that the Driver Facing Disclosures of Total Rider Payment both alter the content of Uber's speech and prevent Uber from speaking until the compelled message is shared, and risk that Uber's message is never received or understood.  These same issues arise in the context of UberX Share rides.

---

[33] *See* Dkt. 29-1at 5–6 (Senator Rodriguez testimony).

**B.** *The Rider Facing Disclosure of Driver Earnings (§ 11(d)(II))*

**58.**    The Rider Facing Disclosure of Driver Earnings requires Uber to disclose to riders immediately post–trip and before giving the option to tip, the "(II) The total amount of money that the driver received or will receive for the transportation task before any tip is added, excluding pass–throughs."  TNC Act § 11(d)(II).  Like the Driver Facing Disclosures of Total Rider Payment, this provision requires Uber to attempt to follow vague mandates as to how to present the disclosure—*i.e.*, "prominently displayed" in a way that "draw[s] the eye[s] to the information" immediately following a trip.  TNC Act § 11(e).

**59.**    This is a novel and unnecessary requirement.  Uber already provides riders with rider price, but it does not want to provide riders with driver earnings information (as this information is unnecessary), and thus the Rider Facing Disclosure Requirements' compel this earnings speech.  Because the Disclosure Requirement prevents riders from tipping before Uber gives the compelled message this Requirement also works to prevent Uber from speaking until the compelled message is shared.

1.    The Rider Facing Disclosure of Driver Earnings Will Promote
        Misconceptions Around Driver's Earnings and Service Fees.

**60.**    Previously, after a ride was complete, the first screen that riders saw presented them with the option to rate their driver and to add a tip for their driver.  Below is an example of this screen.



**Figure 9**

61.     Riders are not required to keep their App open after beginning a trip.  Riders may
close the app entirely, and not reopen it for any number of hours or days.  Riders also receive an
emailed receipt with the total price paid for the ride and an accompanying breakdown of the fees
charged for that ride, which includes a stated Booking Fee, and any other fees and taxes, where
applicable.  Rider receipts further provide a breakdown of insurance fees and mandatory
taxes.  Furthermore, the App also discloses to consumers that 100% of any tip they provide goes
to drivers.

62.     The TNC Act requires Uber to change the Rating Screen to provide riders with
information that distorts how much Uber charges drivers as its Service Fee is incomplete and out
of context.  Similar to the Driver Facing Disclosures of Total Rider Payment, this Requirement
compels Uber to disclose the total amount the rider paid and the amount the driver earned,

excluding pass-throughs (*i.e.*, fees reimbursed to the driver, such as tolls and airport access fees), and juxtaposes the two against each other immediately post trip—in a font larger than anything else. This presentation distorts how much the driver paid to Uber and makes it appear like Uber pockets the entire difference when in actuality Uber is paying costs incurred by and for the driver and mandated by the State. It misleads and confuses riders about the amount drivers actually receive and the amount Uber actually retains.

63.     At bottom, and as the State effectively concedes, this Disclosure Requirement is an attempt at shaming Uber, and similarly situated companies, into changing its fees and causing unnecessary uproar around inaccurate data. Incomplete information does not help consumers and the State cannot explain how doing so would advance the Act's purpose. It also cannot explain why riders need driver's earnings information or what harm riders suffer without it. Nor can it explain why, if this information were truly important to a consumer's ability to tip, the Act excludes taxi companies and non-App rideshare companies. *See* TNC Act § 1(q).

64.     Further, understanding the difference between what the rider pays and what a driver earns on a trip requires proper context that cannot be adequately provided on a single screen, and may be difficult to understand at a time when a person is not receptive to getting that information, for example, at the end of a ride when exiting a vehicle. Thus, the required disclosures distort riders' views of Uber's revenues and drivers' earnings.

65.     As previously stated, this is a novel requirement. For that reason, providing riders with proper context on earnings would be especially important. Otherwise, a rider will be unable to appreciate the information mandated by the Rider-Facing Disclosure Requirement. For example, riders might not realize that the figure does not include reimbursement amounts the driver

may receive (*e.g.*, pass-throughs). Riders would also not likely understand that a significant part of the difference between what they pay and what a driver receives is made up of mandatory operational costs to acquire costs like insurance, as set forth by Colorado state law.

66.    This distorted understanding does not advance the Act's purported goal of disclosing "how much money [is] going to the company" and "how much money's going to the Driver."[34]  In fact, it just risks that consumers make decisions based on incomplete and distorted information, which would not "enable" riders to decide "which TNC best aligns with their values."[35]

2.  Compliance Will Have a Chilling Effect on Rider Tipping

67.    Section 11(d) is burdensome and will have a chilling effect on rider tipping. To comply, Uber added all the required earnings information to the existing rating/tipping screen—the first screen that riders see after a ride—*see supra* ¶ 60.  Even if it had created a new screen flow for Colorado riders, which would have been burdensome for Uber to redesign, compliance detracts from the rider's experience.  Calculating, pulling and presenting the required information takes about a dozen seconds.  Riders may not wait that long and may forget to tip or choose not to tip at all.  Further, Uber had to disable the option to tip while on trip, because it is prohibited from providing an option to tip until the mandated information is available, and it is not until the trip is complete.  And without this option, users have fewer touchpoints for tipping.  For example, some riders who would have usually tipped using the ion-trip option may not pursue other options to

---

[34] *See* Dkt. 29-1at 5–6 (Senator Rodriguez testimony).

[35] *See* Scott Moss's & Jared Polis's Opposition to Motion for Preliminary Injunction at 12, Dkt. 29; *see also* Dkt. 29-1 (testimony prior to Act's passage explains the Act "empowers consumers … to make informed decisions about where [their] money goes").

tip. Early indications show that tipping has in fact decreased in Colorado following Uber's compliance with the law in February, 2025.

68.     The Rider Facing Disclosure of Driver Earnings presents unique challenges for UberX Share. Compliance means that Uber is not able to show any rider on an UberX Share trip the total amount of the driver's earnings on the UberX Share trip until the last rider is dropped off, at which point the trip is complete. Meaning, riders who were dropped off earlier on an UberX Share trip may not be presented with the option to tip for a significant length of time, which gives riders time to forget to tip altogether, and again depressing the frequency of tipping overall.

### C. Driver Facing Disclosures:  Aggregated Mileage and Time Disclosures (TNC Act § 11(a)(III)–(IV)

69.     The Aggregated Mileage and Time Disclosure Requirements require Uber to disclose to its drivers at the time drivers receive an Offer Card:  "the aggregate estimated mileage that the driver will drive during dispatch platform time and consumer platform time for the transportation task" and "the aggregate estimated time that the driver will spend during dispatch platform time and consumer platform time during the transportation task."  TNC Act § 11(a)(III)–(IV).

70.     What this means is that Uber has to provide *one* combined metric for the time to reach the consumer and the ride itself, and another combined metric for the miles to reach the consumer and the miles the ride itself will take. By combining these metrics, Uber deviates from its prior Offer Card format and strict compliance would reduce the information many Colorado drivers have about the different portions of a potential trip (*i.e.,* separates estimates for (a) how much time they have before they pick up a rider and (b) how much time the ride may take)).

71.     When a driver is in what the Act calls "available platform time," they may receive requests from riders looking for a ride.  Currently, drivers in Colorado and throughout the country are shown the terms of a ride, including disaggregated mileage and time, via an in-app screen that Uber calls an "Offer Card."   A driver can choose to accept or reject the ride after seeing the Offer Card.

72.     Uber prefers to present information about the length and duration of a ride in disaggregated form—*i.e.*, providing separate figures for time and miles it takes to reach a consumer, and separate figures for time and miles the ride itself will span—which provides drivers with more insight into the specific legs of a trip.  For example, drivers may want to understand how long they need to travel to the pick-up location compared to the length of the trip, and how long they will have a rider in their vehicle as opposed to being alone.  For these reasons, Uber wants to provide the time and distance for the period en route to the pickup separately from the time and distance from the pickup location to the final destination.

73.     Yet, the Aggregated Mileage and Time Disclosures compel Uber to speak in a way it otherwise would not.  To comply with the Aggregated Mileage and Time Disclosures, Uber has only two realistic choices: (1) it can remove the information that Uber believes drivers find helpful, and provide only the aggregated information compelled by the TNC Act, or (2) it can provide both aggregated and disaggregated information to give its consumers the information they want and also the less helpful information compelled by the law.

74.     This latter option required Uber to design an offer card that is text-heavy and cluttered.  This increases safety risks for drivers who receive Offer Cards when they are on the road.  This presents safety issues to drivers, who often parse and accept Offer Cards while on the

road and while completing other rides, which is one of the reasons why Uber only provides information that is absolutely necessary for the driver to understand the scope of the ride.

75.     Additionally, disaggregated time and mileage information is more accurate for drivers, as riders may delay at pick-up or may change their pick up location, thus making the estimated total of time or mileage inaccurate. By disaggregating these values, Uber is able to provide drivers more accurate information about which portions of the drive will include a rider.

76.     Complying with the Aggregated Mileage and Time Disclosure Requirement thus changes how Uber communicates to drivers now on the Offer Card in Colorado, and required Uber to build at least one new offer card just for Colorado that risks distracting drivers with unnecessary, duplicative and unhelpful time and mileage information to ensure drivers receive the  helpful speech that Uber  prefers to make to its driver customers.

### D.  Required Reporting Disclosures, Including IRS Mileage Deductions (TNC Act § 11(f)(III)–(IV))

77.     The Disclosure Requirements set forth in Section 11(f) alter the content of Uber's speech by compelling Uber to give inaccurate information and speak a message that is not its own—*i.e.*, to make tax calculations and to break out information in a way that is inconsistent with Uber's technology and approach.

78.     Under TNC section 11(f)(III) and (IV), Uber must disclose to drivers the time spent on Uber's digital platform in available platform time, dispatch platform time, and consumer platform time, and the miles driven during each period. Under section 11(f)(V), Uber must also provide drivers with "[t]he total amount the driver may be entitled to deduct from income calculated using the IRS business mileage deduction rate for all miles known to the TNC to have been driven during . . . [a]vailable platform time, [d]ispatch platform time, and [c]onsumer

platform time" TNC Act § 11(f)(III)–(V). Further, staff for the CDLE have informed Uber that

the disclosures required by TNC Act Section 11(f) cannot include time, mileage, or earnings that

include metrics related to Uber's delivery platform.

### 1. Uber Did Not Previously Provide Tax Advice

79.     Prior to the TNC Act taking effect, Uber did not provide tax advice to drivers that

use Uber's mobility marketplace. Rather, it provided limited guidance consistent with its role as

a service provider.[36] Drivers are in charge of calculating and filing their own taxes and collecting

the required information to ensure that their data entries are correct.

80.     Uber provided them with monthly and annual tax summaries, in addition to a 1099–

K and 1099–NEC (where applicable).

### 2. Compliance With the IRS Disclosures Compels Uber to Provide Consumers with Inaccurate and Misleading Information.

81.     Compliance with these Disclosure Requirements requires Uber to alter its

speech. But Uber is not a tax advisor. It does not want to be compelled to wade into the provision

of tax advice or federal tax information subject to change (such as IRS rates), nor calculate specific

numbers for drivers to potentially deduct from their pay, which may be affected by different

potential methods of expense calculation.

82.     Further, only a driver knows their intent and purpose of the miles driven while in

"available platform time," which drivers can enter by simply tapping a button in-app, regardless

of their intent or desire to actually receive trip requests. Drivers could be engaging in a number of

---

[36] *Tax responsibility for Uber drivers and couriers*, Uber,
https://help.uber.com/en/driving-and-delivering/article/-tax-responsibility-for-uber-drivers-and-couriers?nodeId=4d959f38-520e-4387-8eab-c01454cc3744 (last visited Jan. 8, 2025).

non-Uber related tasks or simply have failed to turn off the App. Notably, these Disclosure Requirements require Uber to calculate a specific dollar amount for a potential deduction that drivers could presumably make more accurately themselves because only a driver knows the purpose of the miles driven while being "online" on the Uber platform. The law thus requires Uber to not only perform math for drivers but also to make speculative and potentially inaccurate representations to its drivers about their potential deductions and tax issues.

83.    Colorado has no interest in drivers receiving tax rate information, suggestions about deductibility, or math from Uber, especially in matters related to federal taxes.

3. <u>Uber Cannot in a Feasible Way Separate the Required Metrics Between Mobility and Delivery Platforms and Doing so Violates its Views.</u>

84.    Defendant has informed Uber that the reports mandated by Section 11(f) cannot include any metrics related to time or mileage or earnings on the delivery platform. Thousands of drivers in Colorado perform services on both the mobility platform and the delivery platform. In other words, they may go online (available platform time) and seek out and perform requests for rides and also requests for transportation. Uber makes both types of offers available through a single app, and its philosophy is to make both types of earning opportunities available to drivers who want them, to help them maximize their earnings. Drivers can select whether they want mobility, delivery, or both types of opportunities. For drivers who have indicated willingness to complete both mobility and delivery opportunities, Uber's technology does not differentiate between mobility and delivery for available platform time, and the distinction is non-existent. There is no feasible and reasonably scalable way to separate out available platform time to delivery and not mobility, and doing so would require a cumbersome and difficult manual

process involving retroactive re-allocation. This approach also contradicts Uber's view that drivers may choose to perform both types of services and earn on both marketplaces.

**V.    The Disclosure Requirements Compel Uber to Express a Specific, Controversial Message and Espouse the State's Views.**

85.    At bottom, the Disclosure Requirements compel Uber to adopt the State's view on controversial subjects such as Uber's share of a rider's payment in the gig economy and rideshare companies' and individuals' tax reporting responsibilities. Adopting the State's viewpoint is not only improper content regulation that is harmful to Uber's business but it also will lead to confusion around issues that Uber has consistently sought to clarify to avoid misconceptions around driver earnings that tend to mislead drivers in a way that is harmful to them, including by keeping drivers from using the platform to earn profits.

86.    Compliance with the Disclosure Requirements requires Uber to provide drivers with inaccurate information about their earnings and inaccurate information around their taxes, both of which are harmful to Uber. Some examples of just how controversial rideshare companies, like Uber's, viewpoints on driver earnings and Service Fee can be:[37]

> a.    Drivers themselves debate earning amounts and fees. *See* @ uberman81, Reddit,                                    https://www.reddit.com/r/uberdrivers/ comments/11x51s8/uber_takes_almost_half_of_our_pay/?rdt=45084 (last visited January 8, 2025) (comment thread discussing Uber fees and pass-through costs); *see        also        @        armored_skier,        Reddit,* https://www.reddit.com/r/uberdrivers/comments/18zgfoa/am_i_the_only_one_ma

---

[37] *Service Fee, explained*, Uber, https://www.uber.com/us/en/drive/driver-app/service-fee/ (last visited Jan. 8. 2025).

king_a_living_off_of_uber/ (last visited January 8, 2025) ("I get that earnings used to be better a few years ago, but earning right now, at least where I am, are liveable (sic)."); *See* @ sassiecass33, Reddit, https://www.reddit.com/r/uberdrivers/comments/vky7j6/what_does_the_service_f ee_adjustment_mean_when/ (last visited January 8, 2025) (screenshot from a user asking a question about service fee breakdown, with commenters explaining what the "service fee adjustment" line means).

87. These examples illustrate how the Disclosure Requirements are controversial. As relevant here, the information that the Disclosure Requirements compel Uber to provide are not commercial speech under First Amendment law and are non-factual and controversial information. The State cannot explain how compelling inaccurate speech advances the Act's purported goals of "transparency" or "protections for drivers" and thus, the Act should be enjoined.

## VI.    The Act's Required Disclosures Are Burdensome

88. In addition to their negative impact on the consumer experience by decreasing the clarity of disclosures and requiring Uber to redesign the App in ways that put driver safety at risk and misleads riders, the Disclosure Requirements are technically difficult to implement, expensive, burdensome on Uber's operations, and burdensome on Uber's speech.

89. For example, the Aggregated Mileage and Time Disclosure Requirement and Driver Facing Disclosures of Total Rider Payment are driver facing requirements that will significantly alter Uber's current driver disclosures. These changes require, at a minimum, redesigning in-app experiences, which increases the technical maintenance costs associated with Uber's mobility marketplace.

90.     As another example, the IRS Mileage Disclosure Requirements require Uber to create a new operational structure to process metrics in ways that Uber has never done before. At a minimum, this has required collaboration across several teams who have had to change their reporting mechanisms on driver mileage data in ways that, as explained above, serve to decrease accuracy rather than improve it. And, even where Uber is able to make changes, engineering adjustments require bespoke efforts that are not manageable in perpetuity.

91.     These unconstitutional Disclosure Requirements raise the specter that other states will try to compel Uber to adopt their own government's viewpoints, on matters of what information is compelled, when it is compelled, and where it is compelled, and even the font size. The operational burden to Uber of creating and maintaining at least 50 different App configurations to satisfy each state's unsupported preferences cannot be overstated.

92.     Further, every surface on which Uber is compelled to speak the State's mandated message is a surface that Uber could present a different message or data point to its users. There is a finite amount of space on a smartphone screen. Every mandated disclosure pushes out a potential statement by Uber.

93.     Importantly, these burdens are not outweighed by any government interest articulated in the Act.

## CLAIM FOR RELIEF

**COUNT I: Declaratory Relief and Preliminary and Permanent Injunctive Relief for Violations of the First Amendment to the United States Constitution (42 U.S.C. § 1983) As Applied**

94.     Uber re-alleges and incorporates by reference all allegations set forth in paragraphs 1–93 above.

Case No. 1:25-cv-00096-DDD-KAS    Document 53    filed 02/14/25    USDC Colorado
pg 40 of 48


**95.**     The First Amendment to the U.S. Constitution, applicable to state and local governments through the Fourteenth Amendment's Due Process Clause, protects the right to free speech, including the rights to not speak and to not express views which are not a person's own and with which a person disagrees.  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013).

**96.**     The First Amendment forbids the State from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *See Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972).  For this reason, the State cannot "compel a person to speak its own preferred messages," *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023), as this "alter[s] the content of their speech."  The TNC Disclosure Requirements violate the First Amendment to the United States Constitution, as applied to Uber, because they are content based.  They are thus presumptively unconstitutional and subject to strict scrutiny.  *See Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 166 (2015) ("Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny.").

**97.**     The Disclosure Requirements prevent Uber from expressing its preferred message by mandating specific-government messages, even where Uber has already provided a message that is not misleading or harmful to consumers.  The Disclosure Requirements fail all levels of strict scrutiny because the State cannot prove they are "narrowly tailored to serve compelling state

interests." *Reed*, 576 at U.S. 163, 171 (noting it is the government's burden to do so).  The State cannot prove, as it must, that the purported interest supposedly served by the Disclosure Requirements—"transparency"—is a compelling one, at least as to Uber, or that it remedies any harm.

98.    The State also cannot show that the Act regulates core commercial speech and is thus subject to intermediate scrutiny.  Core commercial speech is speech that does no more than "propos[e] a commercial transaction."  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562 (1980).  This is speech that "merely advertises a product or service for a business purpose."  *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996).  The Disclosure Requirements regulate speech unrelated to any advertisement of Uber's products or services; they are not core commercial speech.

99.    And while compelled speech that is purely factual and uncontroversial may pass constitutional muster by a government showing that the speech is reasonably related to a substantial government interest and would not be unduly burdensome, none of that applies here.  *See Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985).

100.    As discussed *supra* ¶¶ 46–66, the Driver Facing Disclosures of Total Rider Payment and Rider Facing Driver Earning's Disclosures are outside *Zauderer* because they require Uber to present earnings information in a misleading way.  *See CTIA–The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 847 (9th Cir. 2019) ("We recognize, of course, that a statement may be literally true but nonetheless misleading and, in that sense, untrue.").  Information about earnings and Uber's accuracy in reporting to users can be

controversial, *see supra* ¶ 86 (media excerpts describing how controversial rideshare companies, like Uber's, viewpoints on driver earnings can be and how important it is that Uber to remain true to its commitments as to transparency around its Service Fees).

101.     **The Driver Facing Disclosures of Total Rider Payment (TNC Act § 11(b)) and the Rider Facing Disclosure (TNC Act § 11(d)(II)) Requirements** compel Uber to alter its current speech, by requiring it to share incomplete and misleading driver earnings and Uber Service Fee information with riders and drivers, and to do so immediately after a trip. Simultaneously, until it provides such information, the Requirements restrict Uber from communicating with or soliciting information from drivers and riders. These Requirements thus compel Uber to speak a specific government message *and* restrict Uber from speaking until it does so, making them content-based and subject to strict scrutiny.

102.     Both Disclosure Requirements fail all levels of scrutiny. The Driver Facing Disclosures of Total Rider Payment is not narrowly tailored to the State's alleged purposes of "transparency" and "driver protection," which are inadequate. The Rider Facing Disclosure Requirement fares no better. Furthermore, there are less restrictive alternatives to both. For example, Uber already provides drivers with information about their earnings and Uber's Service Fees in receipts and weekly earnings reports and personalized in-App breakdowns.

103.     For similar reasons, the Driver Facing Disclosures of Total Rider Payment and the Rider Facing Disclosure fail intermediate scrutiny. The State cannot meet its burden of showing that the disclosures "directly [and materially] advance[] [a substantial] government interest" or that they are not "more extensive than is necessary to further that interest." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566. As with strict scrutiny, "transparency" and "protecting drivers" are

too broad and nebulous to be substantial interests. *See U.S. West v. F.C.C*, 182 F.3d 1224, 1234–35 (10th Cir. 1999). And because the Driver Facing Disclosures do not remedy any real harm—since drivers already receive time, mileage, and earnings information—the State cannot prove that its interests are substantial.

104.    The State also fails *Zauderer* scrutiny because the Driver Facing Disclosures are "broader than reasonably necessary" to meet the State's interests and is "unduly burdensome." *Zauderer*, 471 U.S. at 651.

105.    Importantly, the **Display Requirements (TNC Act § 11(e))** that accompany both of these disclosures consist of vague requirements as to how Uber must alter the format in which it speaks its message—*e.g.,* "prominently" and—importantly, decreases driver safety because the required disclosures must be displayed on the drivers' screens in a way that is overly-distracting while they are on the road (*i.e.,* "presented . . . to draw the eye to the information"). These requirements are vague and fail all levels of scrutiny for the aforementioned reasons.

106.    The **Aggregated Mileage and Time Disclosure Requirements  (TNC Act § 11(a)(III)–(IV))**, which require Uber to provide drivers with an Offer Card that displays aggregated estimates of trip duration and mileage, compel information that Uber prefers to provide to drivers in a different format. There is no explanation as to why aggregated mileage and time information, as opposed to disaggregated information advances the State's interest. The least restrictive alternatives here are clear: disaggregated disclosures.

107.    These Requirements also fail Intermediate and *Zauderer* scrutiny for similar reasons. As with strict scrutiny, "transparency" and "protecting drivers" are too broad and nebulous to be substantial interests. *See West, Inc.*, 182 F.3d at 1234–35 (government cannot

"merely assert[] a broad interest" but "must specify the particular notion … and the interest served"). And because the Driver Facing Disclosures do not remedy any real harm—since drivers already receive time, mileage, and earnings information—the State cannot prove that its interests are substantial. As with strict and intermediate scrutiny, the State must show the Rider Facing Disclosure of Driver Earnings remedies a "real" rather than "hypothetical" harm. *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 777 (2018). It cannot do this because Uber already provides time, mileage and earnings information, making the disclosures "broader than reasonably necessary" and "unduly burdensome."

108.    **Reporting and IRS Disclosure Requirements (TNC Act § 11(f)(III)-(V))** compel Uber to provide tax advice and other reporting metrics, which it is not able to do because it cannot accurately calculate this information. For example, the TNC Act requires Uber to make a tax calculation: multiply the IRS business mileage deduction rate by all miles known to the TNC to have been driven during the driver's available platform time, dispatch platform time, and consumer platform time. Because Uber cannot accurately determine a driver's intent and conduct during available platform time, this calculation risks being inaccurate. As such, it does not advance the TNC Act's stated purpose of increased transparency. On the contrary, the State cannot show that this requirement is narrowly tailored. Furthermore, there are less restrictive alternatives, such as the State communicating to people what federal rates are and how to do the multiplication, or allowing drivers to make calculations about tax deductions themselves or with the help of a tax consultant.

109.    Importantly, the TNC Act § 11(f)(III)(A) and (IV)(A) compel Uber to provide the available platform information, broken down between mobility and delivery, that it cannot

accurately discern, and compel Uber to speak in ways that infringe upon its free speech rights, as explained above.  The IRS Disclosure Requirements compel content-based speech that goes beyond proposing a commercial transaction, is potentially inaccurate tax advice, and is thus inherently controversial.

110.    For similar reasons, the IRS Disclosures fail intermediate scrutiny.  As with strict scrutiny, "transparency" and "protecting drivers" are too broad and nebulous to be substantial interests.  *See U.S. West*, 182 F.3d at 1234–35.  And because the IRS Disclosures do not remedy any real harm—since drivers already have their own direct access to and in any event receive sufficient mileage information to complete their taxes—the State cannot prove that its interests are substantial.  Further, the IRS Disclosures do not "directly and materially advance" the State's interests because they will require Uber to share speculative information with drivers, thereby reducing transparency and compromising driver safety.  In fact, the State of Colorado has limited to no interest in federal tax matters.

111.    The State also cannot satisfy *Zauderer* scrutiny because it cannot show the IRS Disclosures remedy a "real" harm since Uber already provides information sufficient to allow drivers to calculate their own taxes, making the disclosures "broader than reasonably necessary" and "unduly burdensome."

112.    There is a *bona fide* and actual controversy between Uber and Defendant because Defendant is charged with enforcing the Disclosure Requirements, and has not expressed any intention not to do so, even though the Requirements violate the First Amendment to the Constitution.

**113.**    Uber maintains that TNC Act Section 11's Disclosure Requirements are illegal and unconstitutional and Defendant claims otherwise.

**114.**    Uber requests a judicial determination regarding the validity of the Disclosure Requirements to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of Uber's constitutional rights, which would occur if Uber were forced to comply with the Disclosure Requirements or have the Requirements applied against Uber.

**115.**    In light of the violation of the First Amendment to the United States Constitution, Uber seeks permanent injunctive relief against enforcement of TNC Act Section 11, specifically the Driver Facing Disclosures of Total Rider Payment (§ 11(b)(I)–(III)); a Rider Facing Disclosure of Driver Earnings (§ 11(d)(II)); Aggregated Mileage and Time Disclosures (§ 11(a)(III)–(IV)); TNC Act § 11(e) ("Display Requirements"); and TNC IRS Disclosures (§ 11(f)(III)–(V)) ("IRS Disclosures").  Uber is suffering daily irreparable harm through compliance with the Act, and the aforementioned Disclosure Requirements specifically, and has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Uber respectfully requests that this Court:

a.    Issue a permanent injunction enjoining: TNC Act Section 11, specifically the Driver Facing Disclosures of Total Rider Payment (§ 11(b)(I)–(III)); Rider Facing Disclosure of Driver Earnings (§ 11(d)(II));  Aggregated Mileage and Time Disclosures (§ 11(a)(III)–(IV)); TNC Act § 11(e) ("Display Requirements"); and TNC IRS Disclosures (§ 11(f)(III)–(V)) ("IRS Disclosures"), including

prohibiting enforcement by Defendant and his employees, agents, and successors, including but not limited to the Colorado Department of Labor and Employment as against Uber;

b.     Enter a judgment declaring that the Act violates Uber's right to free speech and free association under the First Amendment to the U.S. Constitution and that it  cannot be applied against Uber;

c.     Award Plaintiffs costs, including reasonable attorneys' fees; and

d.     Grant such other and further relief as the Court deems just and proper.

Dated:  February 14, 2025                    Respectfully submitted,


                                             *s/ Simona A. Agnolucci*
                                             _____
                                             Frederick R. Yarger
                                             Katie A. Reilly
                                             Virginia M. Creighton
                                             WHEELER TRIGG O'DONNELL LLP
                                             370 Seventeenth Street, Suite 4500
                                             Denver, CO 80202
                                             Telephone:   303.244.1800
                                             Facsimile:    303.244.1879
                                             Email:   reilly@wtotrial.com

                                             WILLKIE FARR & GALLAGHER LLP
                                             Michael J. Gottlieb
                                             Jeremy Bylund
                                             1875 K Street N.W.
                                             Washington , DC 20006-1238
                                             Telephone:   202.303.1016

                                             WILLKIE FARR & GALLAGHER LLP
                                             Simona A. Agnolucci
                                             Jonathan A. Patchen
                                             Argemira Flórez
                                             Alyxandra N. Vernon
                                             333 Bush Street, Floor 34
                                             San Francisco, CA 94104


                                             Attorneys for *Uber Technologies Inc.*